The People of the State of New York ex rel. Sarah E. Palmer et al., Appellants, *v.* Eugene M. Travis, as Comptroller of the State of New York, Respondent.

Court of Claims — jurisdiction to determine title of land as between claimant and the state — mandamus — proceeding to compel comptroller to pay judgment of Court of Claims for land taken for a terminal for Barge canal — the fact that no certificate has been furnished by attorney-general showing that no appeal has been or would be taken by the state no defense when judgment has been affirmed by Appellate Division and Court of Appeals and no appeal lies to United States Supreme Court.

1. Upon an application for a peremptory mandamus requiring the comptroller of the state to pay a judgment of the Court of Claims for land appropriated for a terminal to the Barge canal objection was made that the papers on the application did not show that the comptroller had been furnished by the attorney-general with a certificate that no appeal from the judgment of the Court of Claims had been or would be taken by the state, as required by the statute (Code Civ. Pro. § 269). *Held*, in view of the fact that the judgment had been affirmed by the Appellate Division and by this court and the matter has been remitted to the court below to be enforced and no appeal lies to the Supreme Court of the United States, that the objection is without merit.

2. It was further objected that the comptroller could not be compelled to pay the judgment because it was not shown that the attorney-general had filed with him a satisfactory abstract of title and certificate of incumbrances showing that the relators were legally entitled to the award. *Held*, that this was answered by the decision of the courts holding in effect that the abstract filed by the relators showed title in the claimants. (Code Civ. Pro. §§ 269, 274.)

3. Further objection was made that the Court of Claims had no jurisdiction to determine the title of the petitioners, and, therefore, while the amount of damages was fixed, the question as to who was entitled to such damages was still open and undecided. *Held*, that the Court of Claims had jurisdiction to determine the title to the land taken as between the state or one of its municipalities and the relators, to appraise the damages therefor, and to award compensation and payment to the owners. (L. 1911, ch. 746.) (*People ex rel. Smith*

v. *Sohmer*, 163 App. Div. 830; affd., without opinion, 215 N. Y. 709, distinguished; *People ex rel. Swift* v. *Luce*, 204 N. Y. 478; *First Construction Co. of Brooklyn* v. *State of New York*, 221 N. Y. 295, followed.)

4. Upon examination of the questions raised as to the title or interest of the city of New York in the lands for which the award was made, *held*, that the city cannot claim a share in the award either under the statute or under any theory that as against the state it owned the lands in fee and that it has no possible interest in the damages allowed.

5. A party instituting condemnation proceedings may not claim itself to own the property it seeks to condemn, but where the owner takes the initiative and asks for the assessment of damages, he must prove his title against the state. It lies at the basis of his right to an award.

*People ex rel. Palmer* v. *Travis*, 180 App. Div. 25, reversed.

(Argued January 9, 1918; decided March 19, 1918.)

APPEAL from an order of the Appellate Division of the Supreme Court in the third judicial department, entered November 19, 1917, which reversed an order of Special Term granting a motion for a peremptory writ of mandamus to compel the defendant to pay to the relators the amount of a judgment recovered in the Court of Claims for the appropriation of certain real property for a Barge canal terminal.

The facts, so far as material, are stated in the opinion.

*William H. Harris* for appellants. The certificate of the attorney-general that no appeal from the judgment sought to be collected had been or would be taken by the state was not necessary. (Code Civ. Pro. § 269.) A proper and satisfactory abstract of title and a certificate of search as to incumbrances had been filed with the comptroller prior to demand for payment. (*Smith* v. *Sohmer*, 215 N. Y. 709.) The former adjudication in *Palmer* v. *State of New York* is conclusive on all questions of title. (*Palmer* v. *State*, 174 App. Div. 933; 220 N. Y. 565.)

*Merton E. Lewis*, Attorney-General (*Adelbert F. Jenks, Wilbur W. Chambers* and *Blaine F. Sturgis* of counsel), for respondent. The filing of a certificate of the attorney-general that no appeal from the judgment sought to be collected had been or would be taken by the state was a condition precedent, and the failure of the moving papers to allege that such certificate had been filed, or to show a reasonable excuse for the failure to produce such certificate was a valid ground for reversing the order granting the peremptory writ of mandamus. (Code Civ. Pro. §§ 263–281.) The order granting a peremptory writ of mandamus was also reversible on the further ground that the relators' moving papers did not allege or show that a satisfactory abstract of title had been furnished to the comptroller by the attorney-general as required by the statute. This was also a condition precedent. (L. 1911, ch. 746.) The judgment of the Court of Claims is not *res adjudicata* on the question of title. (*L. I. R. R. Co. v. Garvey*, 159 N. Y. 334; *Warren v. Union Bank of Rochester*, 157 N. Y. 259, 276; *Comesky v. Village of Suffern*, 179 N. Y. 393, 398; *People ex rel. Platt v. Rice*, 144 N. Y. 249; *Benedict v. State*, 120 N. Y. 228; *Peacock v. State*, 105 N. Y. 246; *Stewart v. State*, 105 N. Y. 250; *Marks v. State*, 97 N. Y. 572; *People ex rel. Swift v. Luce*, 204 N. Y. 478.) The Court of Claims has no jurisdiction over a question of title to land. (Code Civ. Pro. §§ 264, 269; *People ex rel. Smith v. Sohmer*, 163 App. Div. 830; 215 N. Y. 709; *Matter of Yonkers*, 117 N. Y. 564; *Village of Olean v. Steyner*, 135 N. Y. 341; *Village of Medina v. Graves*, 113 N. Y. Supp. 52; *Matter of Buffalo*, 148 App. Div. 384; *City of Geneva v. Henson*, 195 N. Y. 447; *Matter of Bronx Parkway Comm.*, 99 Misc. Rep. 397; *People ex rel. Wasson v. Schuyler*, 69 N. Y. 242.)

Andrews, J. On March 30, 1915, the Court of Claims awarded to Lowell M. Palmer and others $960,712.50

for damages for land appropriated by the state under the authority of chapter 746 of the Laws of 1911.. This award was based upon the report of Judge HAIGHT, an official referee, to whom on the stipulation of the claimants and the attorney-general had been referred the question of title to the lands involved and the question of damages. There had been some dispute as to whether a part of the lands appropriated belonged to the claimants or to the state or to the city of New York. The referee found in favor of the claimants on this question of title; found that the state had appropriated all the land covered by their claim, and fixed the damages. The judgment of the Court of Claims was affirmed in the Appellate Division (174 App. Div. 933) and in this court (220 N. Y. 565).

As the comptroller did not pay this award an application was made for a peremptory writ of mandamus requiring him to do so. The attorney-general objected to the allowance of the writ on three grounds:

1. Because the papers used on the application did not show that the comptroller had been furnished by the attorney-general with a certificate that no appeal from the judgment of the Court of Claims had been or would be taken.

2. Because they did not show that the attorney-general had filed with the comptroller a satisfactory abstract of title and certificate of search as to incumbrances showing that the relators were legally entitled to the award.

3. Because the Court of Claims had no jurisdiction to determine the title of the petitioners and, therefore, while the amount of damages was fixed, the question as to who was entitled to such damages was still open and undecided.

A peremptory writ of mandamus was allowed by the Special Term. The Appellate Division, however, reversed the order of the court below, denied the motion for the

writ and dismissed it. Such action was founded solely upon the first of the three grounds above stated. From the order of the Appellate Division this appeal is taken.

Section 269 of the Code of Civil Procedure provides that before a judgment of the Court of Claims shall be paid there shall be filed with the comptroller a certificate of the attorney-general that no appeal from the judgment has been or will be taken by the state. We think this provision has no application to cases where appeals from such judgment have been finally decided, where no appeal lies to the Supreme Court of the United States and where we have remitted the matter to the court below to be enforced. All these facts existed in this case. They were known to the comptroller and were before him. The reason of the statute is clear. Should a claimant who has succeeded in the Court of Claims wish to be paid at once such a certificate would reasonably be required. Two courses are before the state. It may pay or it may appeal. The alternative is no longer open. Nor could the court by mandamus or otherwise compel the attorney-general in this case to sign such a certificate. For it would be false in fact. And if the section is to be construed strictly the mere statement that no further appeals are to be taken would not be a compliance with its terms.

As to the second objection, that where lands are appropriated for public use there must be filed with the comptroller a satisfactory abstract of title and certificate of search as to incumbrances showing that the person demanding such damages is legally entitled thereto, we think the requirement has been complied with. Section 8 of the act under which this appropriation was made speaks of the duty of the attorney-general to furnish the comptroller and the treasurer all searches necessary to prove the title to the lands taken. But this duty has reference *solely to cases* where a settlement is made with

owners of such lands. The precise objection made is that it is not shown that the attorney-general had furnished such an abstract. But such requirement not being made by the statute, equally is not made by section 269 of the Code. The abstract is to be filed. By whom is not said. Ordinarily it would be assumed. that the burden of satisfying the requirements of the statute rested on him who wished for action thereunder. That this was the intention of the legislature is implied by section 274 which provides an allowance in certain cases to the claimant for the cost of these very papers. But the abstract .must be satisfactory and show that the person who demands the damages is legally entitled thereto. Satisfactory to whom the respondent asks. To no one in any personal sense. Neither the comptroller nor the attorney-general may say arbitrarily we are not satisfied with the abstract; it does not show the claimant entitled to damages. In the last analysis the question is one of law. Is the abstract satisfactory in form? Does it show what the statute requires it to show? That question is to be answered by the courts. Undoubtedly, the comptroller does and should consult with the attorney-general. But on neither officer rests the ultimate decision. Only if there is some reasonable doubt should their rejection of the abstract be sustained. Here, however, the referee, the Appellate Division and this court have in effect held that the abstract filed by the relators does show title in them.

There remains what we consider the most important question — whether the Court of Claims had jurisdiction to determine the title to the land taken as between the state or one of its municipalities and the appellants.' If it did not, such jurisdiction could not be conferred upon it by stipulation, and the state is not concluded by the decisions which have been made by the various courts.

Chapter 746 of the Laws of 1911 authorized the state to appropriate lands for terminals to be used in connection with the barge canals. If the land so taken belongs to the city of New York it is not to be condemned, but is to be ceded to the state by the city. If the land belongs to other owners, it shall be appropriated in the manner provided by section 8 of the act, and the Court of Claims "shall have jurisdiction to determine the amount of compensation for lands, structures and water so appropriated."

Sections 263 to 284 of the Code of Civil Procedure establish a Court of Claims and regulate its jurisdiction and procedure. Section 264 declares that it shall have "all the powers and jurisdiction of the former Board of Claims." It has also jurisdiction to hear and determine a private claim against the state, including a claim for death by negligence. The section then makes distinct regulations with regard to claims in general and claims for the appropriation of property. The Appellate Division has said that under this section the Court of Claims might not determine the question of conflicting title between claimants. (*People ex rel. Smith* v. *Sohmer*, 163 App. Div. 830.) The affirmance by us without opinion (215 N. Y. 709) of this decision does not imply approval of everything contained in the opinion of the court below. We need not and we do not now determine the effect of a judgment if the outstanding claim of title was in private persons. Such is not the question presented to us.

As a matter of practical construction at least it has been assumed that the respective interests of the state and the claimant might be settled by the Court of Claims. *First Construction Company of Brooklyn* v. *State of N. Y.* (221 N. Y. 295) is the last of the line of cases to that effect. The same assumption was made by the attorney-general in all the courts upon the trial and argument

of the very claim upon which the award was based which gives rise to this proceeding. But the question is of great importance. It has never been directly decided. It is before us in this proceeding. No doubt as to our answer should remain.

The Board of Claims was created by chapter 205 of the Laws of 1883. It was given jurisdiction to hear, audit and determine all private claims against the state, and by section 8 of the act the jurisdiction of the canal appraisers to hear claims against the state was also vested in it. The office of canal appraiser and the state board of audit were abolished.

The office of canal appraiser had existed for many years. Originally where land was appropriated for the canal by the canal commissioners, they applied to the Supreme Court for the appointment of appraisers to estimate the loss or damage occasioned to the owners. As pointed out elsewhere a question of title as between the owners and the state would not arise, for the commissioners might not apply for condemnation and at the same time raise this issue. Later the canal commissioners themselves acted as appraisers. In 1825 two officers known as canal appraisers were created who associated with a commissioner inquired into and assessed the damages for land taken. Their office was continued by the Revised Statutes of 1829. Every person intending to make a claim for the appropriation of land must exhibit it to the appraisers who determined it on evidence taken by them. In 1830 they were given power to appraise damages sustained through the overflow from dams, and in 1870 they were authorized to·hear and determine claims sustained from the canals and their use. This last act referred to a new class of claims. It was an increase of the liability of the state. (*Mark* v. *State of N. Y.*, 97 N. Y. 572; *Heacock & Berry* v. *State of N. Y.*, 105 N. Y. 246.)

Except as provided by these and similar acts no claim could be enforced against the state for the appropriation of land or for other damages.    Obvious injustice resulted. As a consequence applications were made to the legislature for relief from time to time.   Sometimes they were granted by a reference of the claim to the appraisers giving them power to determine liability and assess damages, sometimes by a direct appropriation.   The danger of this last course was obvious.   Therefore in 1875 the Constitution was amended so that it prohibited the legislature from auditing or allowing any private claim against the state.   Then by chapter 444 of the Laws of 1876, the state board of audit was created and given power to hear all *private* claims and accounts against the state " (except such *as are now heard* by the Canal Appraisers according to law)." This was intended to give relief in cases where it could be no longer obtained from the legislature. (*People ex rel. Swift* v. *Luce*, 204 N. Y. 478.)

We have given this history of the statutes because of the contention of the respondent that there is a distinction in the jurisdiction of the Court of Claims with regard to claims for the appropriation of land and other claims — that where it is said it may determine private claims it refers only to the latter — that as to the former its power is confined solely to the assessment of damages for the reason that this was the only power originally possessed by the appraisers.   We do not so construe the statutes.    There was a distinction for many years doubtless between a claim for damages for land appropriated and a claim for damages sustained in other ways.   It consisted in the fact that a remedy was provided in one case and not in the other.   But when the Constitution prohibited the allowance  of private claims it clearly referred to both.   And so when the court was authorized to hear and determine private claims it had the same power whether the claim arose out of one set of facts

or out of the other. Both were private claims. The very
language used in the act creating the board of audit shows
this to be so. It might hear " private claims  *  *  *
against the state (except such as are now heard by the
Canal Appraisers according to law)." The word " such "
has reference to the precedent, " private claims."

Authority for this conclusion may be found in *Super-
visors of Cayuga County* v. *State of N. Y.* (153 N. Y. 279).
Referring to the use of the words " private claims " in
the Constitution, we said this section " was intended to
remedy the manifest evils of special legislation in the
interest of private claimants, and to deprive the legis-
lature of the power to pass laws which directly, and of
their own force, should allow and fix the amount of
private claims against the state.  *  *  *  Private claims
against the state,  *  *  *  mainly arose out of the acts
of the state in appropriating lands for the canals,  *  *  *.
It is plain, in view of contemporary history, that the
words ' private claims '  *  *  *  were intended to desig-
nate claims of the same general character as those which
arose in connection with the administration of the canal
system; that is to say, claims made against the state in
behalf of a private interest, as distinguished from claims
of a public character." (p. 288.)

We, therefore, conclude that the original claim made
by the relators was a private claim and the Court of
Claims was given power " to hear and determine it."
" It will thus be seen that the jurisdiction conferred on
the Board of Claims was of the broadest character
*  *  *.  Indeed, it was impossible that the jurisdiction
of the Board of Claims, so far as the subject-matter of
private claims by or against the state, could be increased,
for already it was universal." (*People ex rel. Swift* v.
*Luce,* 204 N. Y. 478, 484.)

We have then the general power of the Court of Claims
to hear and determine this claim. We have the act

of 1911 stating that this court "shall have jurisdiction to determine the amount of compensation for lands * * * so appropriated." Did this clause show an intention to limit jurisdiction which the court might have otherwise had in these cases to a bare appraisal? "Compensation" involves the idea of a payment to some one — of an award to some one. It involves something more than the mere fixing of the value of the land taken. Under this statute the court had precisely the same power it possessed under the Code. If a court may hear and determine a claim for land taken one of the essential elements that must be decided is the question as to what lands are in fact appropriated. Where, as in *People* v. *Sohmer*, there is a dispute between claimants as to title, it may be that this dispute is immaterial so far as the decision which the court is authorized to reach is concerned. The amount of land appropriated is not questioned. The value of that land may be ascertained and when this is done the claimants may settle their disputes between themselves. But where the state claims title to any lands which under its appropriation map it has assumed to take, this question of title must necessarily be settled before any award can be made. The quantum of the appropriation is the very point at issue and is necessarily involved in determining the amount of compensation to be made. Jurisdiction to determine this question must necessarily be conferred upon the court whenever it has power to fix the compensation for the land appropriated.

We think this conclusion is fortified by another provision contained in section 264. No award may be made against the state "except upon such legal evidence as would establish liability against an individual or a corporation in a court of law or equity." In a court of law the title of the claimant against the trespasser or him in possession would be directly in issue. It could be

proved and consequently decided. Nor is the conclusion weakened by the provisions of section 269 that where awards are made for permanent appropriation of land the abstract of title must be filed showing that the claimant is legally entitled to damages. This does not necessarily involve the idea that the power of the court conferred by section 264 is restricted. It is not an attempt to interpret these powers. Its purpose is obvious. It is the same purpose which inspires the purchaser of land to demand a search. To satisfy itself that there were no adverse claimants — that the land was not subject to mortgage or other liens — a search was required by the state. It was not to settle disputes as to its own title.

It is said, however, that while this may be true where the dispute is between the state and a claimant, here the title may be in the city of New York. Therefore, if the view taken by the Appellate Division in the *Sohmer* case is correct it is applicable here. We do not think so.

It appears from the record in *Palmer* v. *State of N. Y.*, which is before us that the land taken contained 402,810 square feet. Of this 500 square feet was upland to which the relators concededly had title. 173,664 square feet had been under water and had been filled in by them, and 228,646 square feet was still below the surface. Whatever title the city may have had to the land now or originally under water was derived through ancient grants to certain freeholders and inhabitants of the town of Bushwick — the so-called Boswyck patent of 1667, the Dongan patent of 1686 and the Boswick patent of 1708.

The first is a document containing the names neither of grantor nor of grantees, but merely describing certain territory. The second recites a prior patent made by Governor Nicolls on October 25, 1667 (evidently the Boswyck patent) to Peter Johnson and others " for and

on behalfe of themselves and their Associates, the ffree-holders and Inhabitants of a Certaine Towne,   *   *   * commonly called and knowne by the Name of Boswick which said Towne was and now is in the Tenure and occupacon of Several ffreeholders and Inhabitants who were seated by authority   *   *   * which said Towne contains all that Tract together with the Severall Parcells of land which already have or hereafter shall bee Pur-chased or Procured for and on behalfe of the said Towne *   *   *." It then describes a tract of land and states that it shall " from henceforth to be Appurtaine and belong to the said Towne of Boswick together with all Havens, Harbors, Creeks   *   *   * Waters, Rivers, Lakes," to have and to hold " to the said Pattentees and their Associates their Heires Successors and Assignes forever And moreover the said Richard Nicolls Governor Generall as aforesaid Did further Give Grant Ratifie & Confirme unto said Pattentees & their Associates their Heires Successors & Assignes all the rights & privileges of a Towne within this Government." Next it states that Peter Janselert and others, the present freeholders and inhabitants of the town, have asked that the patents be confirmed. Thereupon Governor Dongan grants, ratifies, releases and confirms unto them, freeholders and inhabitants of the town, the lands in question. The patent of 1708 was similar in substance. It recites the Nicolls and Dongan patents and ratifies them as to the then inhabitants of the town, " in Trust Nevertheless and for the use of themselves and the Rest of the ffreeholders & Inhabitants of said Towne."

It has been held that the object and result of these very patents was to confer an estate upon the town. The patentees did not take as individuals or as tenants in common, but the title to the land conveyed was vested in the town as a corporation. (*People* v. *Schermerhorn*, 19 Barb. 540; affirmed in this court, December 26, 1856,

but not reported.) A like construction has been given to similar patents. (*Town of North Hempstead* v. *Town of Hempstead,* 2 Wend. 109; *Denton* v. *Jackson,* 2 Johns. Ch. 320; *Town of Southampton* v. *Mecox Bay Oyster Co.,* 116 N. Y. 1; *People ex rel. Howell* v. *Jessup,* 160 N. Y. 249; *Roe* v. *Strong,* 107 N. Y. 350; *Hand* v. *Newton,* 92 N. Y. 88.) Indeed, the towns as corporations have repeatedly maintained actions in this state to enforce rights claimed by them under such grants.

These grants, if they conveyed the land in question, did so because it was included within the boundaries described in the patents. It formed the bed of tidal streams. The most the town could claim, therefore, was title subject to the public right of navigation and commerce. (*Lewis B. P. Oyster C. Co.* v. *Briggs,* 198 N. Y. 287.) It could claim no more, for the sovereign could not grant more. His rights to such land and to tidal waters was twofold — proprietary as to the land, governmental as to the waters. (*Matter of Mayor, etc., of N. Y.,* 182 N. Y. 361.) The former he could grant, and when he did the title passed to the town. (*Trustees of Brookhaven* v. *Strong,* 60 N. Y. 56.) Whether without the concurrence of Parliament he could grant the latter, not to an individual, but to a municipal corporation, subject always to the right of navigation (*Matter of Mayor, etc., of N. Y.,* cited above), or whether he could not (*People ex rel. Howell* v. *Jessup,* 160 N. Y. 249), and if not whether the grant was ratified by the act of the Colonial legislature passed in 1691, is of little importance. Clearly, the purely political jurisdiction may at any time be resumed. The important question is as to the nature of the proprietary interest. And we limit this question to the effect of similar grants to towns which purport to convey the fee of lands under tidal waters. We do not discuss the rights which the city of New York may have acquierd under the broader language of its various

charters nor are we concerned with such rights of fishery as are referred to in *Robins* v. *Ackerly* (91 N. Y. 98), or in *Trustees of Brookhaven* v. *Strong* (60 N. Y. 56). Assuming that the town of Bushwick possessed a several fishery, it is not necessarily dependent upon the fee of lands under water. It is always subject to the improvement of the waterway for purposes of navigation. But the fishery itself remains, even if the bare title to the land is taken to that end. (*Malcomson* v. *O'Dea*, 10 H. L. Cas. 593; *Attorney-General* v. *Emerson*, A. C. [1891] 649; *Beckman* v. *Kreamer*, 43 Ill. 447.) It is this fee, the land upon which the improvements are to be made, that the state requires under the act of 1911.

As we have said the grant was to a local municipal corporation or quasi-corporation. "It is not a deed conveying private property to be interpreted by the rules applicable to cases of that description. It was an instrument upon which was to be founded the institutions of a great political community; and in that light it should be regarded and construed." (*Martin* v. *Waddell*, 16 Pet. 367, 411.) Under these circumstances we think the town held such lands essentially for public purposes. It was to administer them for the public good. (*Town of Brookhaven* v. *Smith*, 188 N. Y. 74.) They could not be appropriated so as to interfere with the rights of the public. No substantial use could be made of them. It was much the same kind of ownership as that of the city of New York in certain of its streets and they are held for governmental and public use. (*People* v. *Kerr*, 27 N. Y. 188.) So is a ferry landing. (*People ex rel. Mayor, etc., of N. Y.* v. *Board of Assessors, Brooklyn*, 111 N. Y. 505.) And land purchased by a city for a city hall (*People ex rel. Hayden* v. *City of Rochester*, 50 N. Y. 525) or a water works (*City of Rochester* v. *Town of Rush*, 80 N. Y. 302, 310). At any time the government may interfere with the surface to aid navigation. (*Lewis*

*B. P. Oyster C. Co.* v. *Briggs,* 229 U. S. 82.)   In practice such lands are not taxed by the state, although not exempt under section 4 of the Tax Law unless held for a public use.   (*Clark* v. *Sprague,* 113 App. Div. 645.)  The state has assumed to regulate their use as it could not regulate the use of private property.  (L. 1871, ch. 639; Conservation Law [Cons. Laws, ch. 65], § 328.) In *Town of Brookhaven* v. *Smith* (cited below), we held that the right to construct piers and wharves was in the owner of the uplands.  Whoever owned the fee of the land under water it was subject to his right of access to the water.  It seems to follow that the town could not fill in and reclaim such land and so deprive him of it.  Congress may control or prevent the erection of structures upon it.  (*Montgomery* v. *Portland,* 190 U. S. 89.)  In *Bedlow* v. *N. Y. Floating Dry Dock Co.* (112 N. Y. 263–273) we said that certain grants made to the city of New York of land under water which are broader than the grant in question " were obviously made to extend municipal control over said lands, and enable the city to regulate the erection of necessary structures upon the land under water around the island, with a view of promoting facilities for the growing commerce and trade of the port of New York and to regulate and preserve the rights of riparian owners in such lands, and the navigable waters covering them."   We reached the same conclusion with regard to the Dongan charter in *Matter of Mayor, etc., of N. Y.* (182 N. Y. 361). This charter conveyed to the city the tideway surrounding the island. So a barrier was interposed between the river and the uplands which would prevent the sovereign from erecting docks thereon for the accommodation of commerce.  It was the intention " to delegate to the municipality the power to hold and control the tideway in the interests of commerce and of the public " and the city retained "the tideway and the lands under water as trustee of

the public domain in the interests of commerce and of the state." (p. 368.)

An instructive case is *Town of Brookhaven* v. *Smith* (188 N. Y. 74), to which we have referred. Here the town owned land under water by royal grant. We held that notwithstanding the fact that at the date of the grant the owner of the upland had under the common law of England no right to construct a dock without the consent of the owner of the land under water, yet since the Revolution our policy and law were no longer the same, and his right to do so was enforced as against the town. If the grant was regarded as a contract made with a private corporation the rights of the parties were fixed as of its date. If it was something different or something less — if the land were really held in trust for the public through a subordinate governmental agency — then with the change of the rules of law and with the change in what was regarded as public policy it might well be held that the respective rights of the town and the upland owner also changed.

This question as to whether the land under water is held by the city, assuming its title thereto, for governmental purposes may be important. For it has been claimed that there is a distinction between property so held and property owned by a municipality in its so-called private capacity. It is admitted that as to the former the legislature has absolute control. It may take it without compensation or devote it to such public purposes as it thinks best. (*Hunter* v. *City of Pittsburgh*, 207 U. S. 161.) As to the latter, although the distinction has been denied (*Darlington* v. *Mayor, etc., of N. Y.*, 31 N. Y. 164), it has been said that the state is not omnipotent, that the municipal corporation owns such property much as a private corporation owns its property, and that it cannot be taken without compensation or devoted, without consent, to other public uses.

Holding, therefore, that if owned by the city this property was held by it for governmental and public uses, the legislature could have used it for barge canal purposes without compensation. Or it might self limit its rights. It might require of its officers to proceed in a certain way before the appropriation should be made. It might, as it did, require the consent of the city. It might, as it did, resolve to pay the city for the land it intended to occupy. But in a sense this payment would be a gratuity. The statute itself expressly prohibits the taking of the land of the city by condemnation. It is only to be done by agreement. (Section 6.) The city is not a party to this proceeding. It could in no event claim a share in any award, either under the statute or under any general theory that as against the state it owned this land in fee. It has no possible interest in the damages allowed. It and the relators are not rival claimants to the award in the sense that they were rival claimants in the *Sohmer* case.

The appellants argue that the state is estopped, both in this proceeding and elsewhere, from disputing their title. This we doubt. It is true that the party instituting condemnation proceedings may not claim itself to own the property it seeks to condemn (*Matter of City of Yonkers*, 117 N. Y. 564; *Matter of Village of Olean v. Steyner*, 135 N. Y. 341), but where the owner takes the initiative and asks as was done here for the assessment of damages, he must prove his title as against the state. It lies at the basis of his right to an award.

The order of the Appellate Division should be reversed, with costs in this court and in the Appellate Division, and the order of the Special Term affirmed.

CUDDEBACK, J. (dissenting). I dissent. The state comptroller is called upon in this proceeding to pay out of the public funds about $1,000,000, the amount of a

judgment against the state, rendered in the Court of Claims. I think we ought not to say that the comptroller had no right to require the relator to comply with certain statutory regulations applicable to the case before he would pay the judgment — especially as the statutory regulations are simple and easily complied with. . Section 269 of the Code of Civil Procedure provides that " no such judgment shall be paid until there shall be filed with the comptroller *. * * a certificate of the attorney-general .that no appeal from such judgment has been or will be taken by the state." The relator presented no such certificate. It is argued that the section does not apply because there has been an appeal to this court from the judgment of the Court of Claims, and no further appeal lies. How does the comptroller know that? The certificate is his only authority for paying out the money. If he should not follow the law and a loss should ensue, the court would be very quick to hold him personally responsible for the loss. It is said that the attorney-general may refuse the certificate. If he should refuse it, a very different case would be presented from what we have here. It is said the giving of a certificate in this case would be a useless formality, but the observance of formalities is sometimes necessary to protect substantial rights. (*Utica . S. M. Co.* v. *Casualty Co. of America*, 210 N. Y. 399, 404.) I think the comptroller should not be coerced in this matter.

HISCOCK, Ch. J., COLLIN, HOGAN and CARDOZO, JJ., concur with ANDREWS, J.; CUDDEBACK, J., reads dissenting memorandum; POUND, J., dissents.

Order reversed, etc.