OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 Does a riparian owner have the right to conduct “maintenance” dredging of public underwater lands? We conclude that a riparian owner may dredge if dredging is necessary to preserve reasonable access to navigable water and does not unreasonably interfere with the rights of the underwater owner. Because the courts below did not apply this standard, we reverse the Appellate Division order permanently enjoining the dredging, and remit the matter to Supreme Court for proceedings consistent with this opinion.
 

 I.
 

 Since 1929, defendant Commander Oil Corporation has owned and operated a petroleum storage facility on land adjacent to Oyster Bay Harbor in Nassau County. Commander stores gasoline, diesel fuel and home heating oil at the facility. Plaintiff Town owns the underwater land in the harbor. In 1952, replacing a previous pier, Commander built the pier that currently extends from its land into the harbor. Barges dock at this pier while the oil they carry is pumped through pipes to storage tanks.
 

 Barges have mainly docked at the “west basin,” the larger and deeper of the two basins adjoining the pier. Both the east and west basins become shallower as they accumulate silt deposited by a creek that borders Commander’s property to the south, and a sand spit to the south and west. Storm water runoff systems maintained by the Town and by the State of New York contribute to the feilt deposits from these sources.
 

 In 1966, owing to the accumulation of silt, Commander felt it necessary to dredge both basins in order to maintain adequate depth for its barges. Commander performed this dredging with
 
 *569
 
 the Town’s permission, under a lease effective between 1960 and 1985. Commander also had the permission of the United States Army Corps of Engineers, as set forth in a letter in 1966 and permits issued in 1970 and 1975, authorizing it to dredge ultimately to a depth of 14 feet below mean low water. The letter, and the permits, made clear that they conveyed no property rights and authorized no impairment to private property rights.
 

 After the last permit and the lease expired in 1985, Commander did not seek to dredge for a decade. By 1995, the east basin was as shallow as one foot deep in places, while the west basin ranged from 4 to 14 feet. Nevertheless, Commander was still docking well over 100 barges a year at the facility, and traffic continued at this rate at least into 1998.
 

 When Commander sought to dredge, it did not ask the Town for permission, but applied to State and Federal agencies. Granting Commander’s application, the State Department of Environmental Conservation issued a permit effective March 20, 1995. The permit authorized Commander to “maintenance dredge” to a depth of 14 feet, subject to various conditions calculated to minimize the effect of the dredging on vegetated tidal wetlands, spawning shellfish and other environmental concerns. The permit stated that it did not “authorize the impairment of any rights, title, or interest in real or personal property held or vested in a person not a party to the permit.”
 

 One month later, the State Department of State issued a Consistency Certification Concurrence, concurring in Commander’s certification that maintenance dredging was consistent with the Long Island Sound Coastal Management Program. The DOS concurrence contained three conditions. The first reduced the square footage of dredging of the east basin, in order to avoid affecting a neighboring sand spit. The second required installation of a silt curtain during dredging, in order to avoid silting the open water of Oyster Bay. “Because of questions regarding the need for using the east basin,” the third condition was that Commander “receive permission from the owner of the underwater lands, which may be the Town of Oyster Bay, to occupy and use the underwater lands.” The Army Corps of Engineers has not ruled on Commander’s application.
 

 In 1995, the Town brought two CPLR article 78 proceedings in Supreme Court, challenging the DEC and DOS permits. Supreme Court dismissed both proceedings, holding that the
 
 *570
 
 DOS had not abused its discretion and that the challenge to the DEC permit was time-barred. The Town took no appeal.
 

 In September 1996 the Town sued Commander, again in Supreme Court, seeking to enjoin Commander from dredging, and Commander cross-moved for summary judgment. Supreme Court denied the Town’s application for a preliminary injunction, concluding that the Town’s ownership did not entitle it “to deny the upland owner the right to such reasonable dredging as may be necessary to access the navigable part of the body of water using an existing dock or pier.” The court further opined that the Town’s asserted environmental concerns had already been addressed by the appropriate State authorities through the permitting process.
 

 On the Town’s appeal, the Appellate Division reversed. While acknowledging Commander’s right of access to navigable waters, the court held that this right may not interfere with the Town’s ownership of the underwater land, and that Commander, in its cross motion, had not demonstrated that the harbor conditions made dredging necessary to preserve access. The court remitted the matter to Supreme Court with instructions to determine whether the Town was entitled to temporary injunctive relief.
 

 Supreme Court thereafter denied the Town’s application for a permanent injunction, finding that “in its natural condition prior to dredging and the augmented deposit of silt attributable to the Town and State storm water runoff systems both basins of the dock were usable for tying up barges and offloading oil” (177 Mise 2d 1025, 1031 [1998]). Further, noting that the DOS “related its recommendation for Town approval to the issue of the necessity for Commander Oil to utilize the east basin”
 
 (id.,
 
 at 1032), the court found that dredging the east basin, within the limits stated by the DOS, was also necessary. This finding reflected evidence that a viable east basin might diminish the risk of oil spills during storms, and that the DEC and DOS permits had already imposed conditions calculated to mitigate the environmental impact of east basin dredging. The Town introduced evidence tending to show that dredging could cause waves to hit the shore with greater energy, increasing the potential for flood damage. The court noted, however, that the Town had made no claim relating to its Flood Damage Prevention Ordinance, so that determinations based on the wave-related evidence would amount to declaratory relief outside the pleadings.
 

 
 *571
 
 On the Town’s appeal, the Appellate Division again reversed and this time granted the Town a permanent injunction. The court did not question Supreme Court’s key factual finding, which the Appellate Division paraphrased as a finding that dredging was
 
 “reasonably necessary to restore the basins to their natural condition and to maintain a level of access to navigation similar to that which existed when Commander originally constructed its
 
 dock” (267 AD2d 303, 304 [emphasis added]). The Appellate Division held, however, that an upland owner “has no riparian right to dredge public underwater lands in the absence of the public owner’s permission”
 
 (id.).
 
 The court further noted that granting such a “right would limit the Town’s ability, as public trustee of the underwater lands, to balance the many diverse and competing interests in the coastal resource for the benefit of the public”
 
 (id.).
 

 We granted Commander’s application for leave to appeal, and now reverse.
 

 II.
 

 We begin analysis by reviewing settled principles of law. First, Commander has the rights of a riparian owner. Strictly speaking, Commander is a littoral owner, one whose land is bounded by the seashore. A true riparian owner owns land along a river (Dellapenna,
 
 Riparianism,
 
 in 1 Beck, ed, Waters and Water Rights § 6.01, at 88 [Michie 1991 & Supp 2000]). But this distinction is vestigial; we have long used “riparian” to describe owners like Commander
 
 (see, e.g., Tiffany v Town of Oyster Bay,
 
 234 NY 15 [1922]).
 

 Riparian owners generally are entitled to access to water for navigation, fishing and other such uses. Although
 
 Tiffany
 
 and several other authorities most pertinent to this appeal are comparatively old cases, as we have recently suggested riparian owners still enjoy “their full panoply of rights”
 
 (Adirondack League Club v Sierra Club,
 
 92 NY2d 591, 604 [1998]). Accordingly, Commander, like any riparian owner, has the right of access to navigable water, and the right to make this access a practical reality by building a pier, or “wharfing out”
 
 (see, Trustees of Town of Brookhaven v Smith,
 
 188 NY 74, 85 [1907]).
 

 Second, the Town owns the underwater land beneath Oyster Bay by virtue of a colonial patent.
 
 [1]
 
 The Town holds the land in “trust for the public good,” and, as such, has long enjoyed rights
 
 *572
 
 “general in their character, as yet not defined with accuracy beyond the ownership and regulation of oyster beds and some general aid to commerce, navigation, fishing or bathing”
 
 (Tiffany, supra,
 
 234 NY, at 21;
 
 see also, Friends of Van Cortlandt Park v City of New York,
 
 95 NY2d 623, 630 [2001]). In keeping with this public trust, legislation authorizes the Town Board to lease the Town’s common lands, including the foreshore, for oyster culture and other uses, and requires the Town Board to hold a hearing when it receives applications from prospective lessees (Nassau County Civil Divisions Act, L 1939, ch 273, §§ 320.0 — 323.0). Commander does not approach the Town, however, as a prospective lessee, but as a riparian owner enjoying property rights distinct from and not subordinate to those of the Town
 
 (see,
 
 7 Warren’s Weed, New York Real Property, Land Under Water, § 6.05 [4], at 87 [4th ed] [citing
 
 Matter of Town of Hempstead v Little,
 
 22 NY2d 432 (1968)]).
 

 Finally, as a logical implication of the foregoing, neither the Town nor Commander may exercise its rights in a manner unreasonably intrusive upon the other’s rights. The Town’s rights “are at all times subject to the public rights and to the right of the riparian owner to access to the water”
 
 (Tiffany, supra,
 
 234 NY, at 21;
 
 see also, Brookhaven, supra,
 
 188 NY, at 79). Conversely, the riparian owner’s right of access is not “absolute, but qualified by other rights in the owner” of the submerged land; the riparian owner’s rights “cannot be enlarged at will or according to his convenience or necessity”
 
 (Hedges v West Shore R. R. Co.,
 
 150 NY 150, 158 [1896]).
 

 Thus, neither the riparian owner nor the underwater landowner has an unfettered veto over reasonable land uses necessary to the other’s acknowledged rights, and where the rights conflict the courts must strike the correct balance.
 

 In contending that dredging is simply impermissible, the Town relies heavily on
 
 Hedges,
 
 where we concluded that the riparian owners’ right of access to navigable water did not encompass the right to dig á canal from their brickyard out across submerged lands owned by a railroad (under a grant from the public owner) and into the Hudson River. The Town urges that the right to dredge therefore is distinct from the right of access to navigable water and, if granted to Commander, would represent an unprecedented expansion of the rights of a riparian owner.
 

 We do not believe, however, that
 
 Hedges
 
 requires dredging, to be treated differently from other means of exercising riparian
 
 *573
 
 rights of access.
 
 Hedges
 
 holds that a riparian owner has no unqualified right to expand its access by dredging in a manner that would seriously impair the underwater landowner’s rights. In other words, the riparian owner may not adopt “an artificial mode of navigating * * * destructive” of the public owner’s rights
 
 (id.,
 
 at 159;
 
 cf., Rumsey v New York & New England R. R. Co.,
 
 133 NY 79 [1892]). Under
 
 Hedges,
 
 then, the Town would be entitled to an injunction only if it could demonstrate that Commander’s dredging would destroy, or seriously impair, its rights as owner of the underwater land.
 

 Commander contends that it would dredge merely to preserve reasonable access, and that it may do so even under
 
 Hedges.
 
 While we assumed in
 
 Hedges
 
 that the riparian owner could not complain while “the natural condition of things is left practically unchanged”
 
 (supra,
 
 150 NY, at 158), Commander contends that here it is the Town, with its storm water runoff system, that has changed the foreshore from its “natural condition.” Several other cases suggest that when the public owner itself causes a diminution of the riparian owner’s access, the
 
 Hedges
 
 calculus changes.
 

 For instance, as we have noted, the right to wharf out upheld in
 
 Brookhaven
 
 seems to imply “that the town could not fill in and reclaim such [underwater] land and so deprive” the riparian owner of its use
 
 (see, People ex rel. Palmer v Travis,
 
 223 NY 150, 165 [1918]). In
 
 Tiffany,
 
 similarly, we observed that the public owner could not “fill in, occupy and obstruct with buildings the foreshore under the pretext of providing for the public enjoyment, so as to interfere with the rights of owners of the upland, although they may still be able to reach the water”
 
 (Tiffany, supra,
 
 234 NY, at 23). If a public owner cannot actively fill the foreshore in order to construct buildings, it would seem equally improper for the Town passively to fill Commander’s basins with runoff while prohibiting dredging.
 

 Additionally, we have held that a riparian owner’s rights include title to accreted land — land previously underwater, which had emerged due to soil deposits — because this was the only way to preserve the right of access
 
 (see, Hempstead, supra,
 
 22 NY2d, at 437 [citing
 
 Matter of City of Buffalo,
 
 206 NY 319, 325 (1912)]). If a riparian owner may take title to previously underwater land that is fully accreted in order to maintain access, it would seem to follow that the same owner could dredge deposited underwater land that blocks access, especially where
 
 *574
 
 the soil or silt has been deposited by the underwater landowner.
 
 [2]
 

 In sum, well over a century of common law adjudication has established the riparian owner’s right to reasonable access, and nothing in these cases would preclude Commander from dredging to preserve such access, if the court was satisfied that dredging was necessary and did not unreasonably interfere with the rights of the Town. Because this standard was not applied below, we reverse and remit the matter to Supreme Court to strike the appropriate balance.
 

 We underscore that in reversing, we do not hold that, as a riparian owner, Commander has a general right to dredge or a particular right to dredge to maintain the prior depth of the basins.
 
 [3]
 

 The State of New York, as
 
 amicus curiae,
 
 argues that shorelines are inherently mutable, owing to geological forces as well as human activity, and that Commander cannot assert a right to dredge in order to maintain the level of access that it had in 1952, for there is no evidence that the depth of the basins in any particular year reflects the “natural condition” of the harbor. We agree that a riparian owner does not have the right to maintain the foreshore in the precise condition that existed when the riparian owner acquired the land or built a facility for docking. Despite references to the “natural condition” of the land
 
 (see, e.g., Hedges, supra,
 
 150 NY, at 158), our jurisprudence has primarily balanced the public owner’s rights against the riparian owner’s right of reasonable access, rather than against the level of access that existed at any purported historical benchmark.
 
 [4]
 
 The riparian owner’s right is not to
 
 *575
 
 maintain the foreshore in any fixed condition, but rather to enjoy reasonable access to navigable water.
 

 By the same token, as the Appellate Division correctly observed, declaring a “right to dredge” could hinder courts from weighing the duty of public owners like the Town to consider the diverse interests of users of the foreshore, such as recreational users, oyster farmers and commercial navigators of the harbor. A public owner could present such interests as factors relevant to the courts’ balance of riparian and public rights. Although the permitting process before Federal and State agencies may preempt a local government’s attempt to create its own regulatory scheme
 
 (see, e.g.,
 
 1969 Ops St Comp No. 69-112), such preemption would not necessarily impair the public owner’s ability to argue to the court that dredging would harm distinctly local interests not within the purview of the permitting agencies.
 

 Here, however, the Town said little before Supreme Court about local concerns not represented in prior proceedings, relying instead on a more sweeping property right purportedly enunciated in
 
 Hedges.
 
 Such environmental concerns as the Town did raise either diverged from the pleadings (as Supreme Court noted regarding the Town’s “wave energy” argument), or duplicated issues disposed of in the article 78 proceedings, or both.
 
 [5]
 
 In the context of the present matter, the Town cannot now plausibly raise such concerns as factors for consideration on remittal.
 

 As the Appellate Division observed, “Supreme Court improperly held that a private riparian owner has a right to dredge public lands for commercial purposes to the extent reasonably necessary to maintain the same access to navigability as was originally attained by wharfing out” (267 AD2d, at 304). Supreme Court’s standard was incorrect. The issue was not whether Commander was entitled to preserve its original level
 
 *576
 
 of access to navigable water, but whether Commander needed to dredge in order to assure reasonable access. Moreover, it is not apparent that any feasible alternative to dredging was suggested or considered. Because the riparian right is limited to reasonable access, the right must be exercised in a manner that does not unreasonably interfere with the rights of the public owner. The Appellate Division should have remitted to Supreme Court to strike that balance.
 

 Finally, we note that this matter has been before the courts for six years. In remitting, we do not contemplate further proceedings extending the litigation years into the future. For a business like Commander, a determination indefinitely postponed may well be worse than an adverse decision. While we will not direct that Supreme Court make its determination based solely on the existing record, we strongly suggest that it do so insofar as it can.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to Supreme Court for further proceedings consistent with this opinion.
 

 Judges Smith, Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order reversed, etc.
 

 [1]
 

 . Such underwater land is also referred to as the “foreshore,” while the adjoining land is sometimes called the “upland.”
 

 [2]
 

 . Where the matter to be dredged is valuable, the underwater landowner might be entitled to compensation. The State is entitled to collect rents for sand and gravel dredged from its underwater land (see, Public Lands Law § 22), and some courts have assumed that local governments enjoy similar rights (see,
 
 Nance v Town of Oyster Bay,
 
 23 AD2d 9, 23-24 [1965]). That issue is not before us on this appeal.
 

 [3]
 

 . The term “maintenance dredging” has worked its way into the fabric of the case, having been used, for instance, in the DEC and DOS permits. We do not need, for how, to reach the case of another riparian owner who seeks to dredge in order to obtain a level of access it never before had.
 

 [4]
 

 .
 
 Even in
 
 Hedges,
 
 where the result favoring the owner of the underwater land, a railroad, was bolstered by evidence that the “easement of access to the river by the owner of the lands on the shore * * * could still be enjoyed * * * in practically the same way that it had been enjoyed before or was capable of enjoyment in its natural state”
 
 (supra,
 
 150 NY, at 157), we observed, that the same result would obtain “so long as the sovereign or its grantees
 
 *575
 
 provide for a reasonable and suitable mode of access under all the circumstances”
 
 (id.,
 
 at 161-162).
 

 [5]
 

 . We note, however, that the Town’s article 78 proceeding against the DEC, having been dismissed on statute of limitations grounds, did not result in an adjudication of any environmental issues on the merits, and thus could not collaterally estop the Town from raising such issues in this action
 
 (see, Ryan v New York Tel. Co.,
 
 62 NY2d 494, 500 [1984]). To that extent, Commander’s reliance on the doctrine of collateral estoppel is misplaced. The Town’s environmental arguments remain unsupported, but, in another action, better local environmental arguments with better evidence, distinct from those squarely addressed in article 78 proceedings, would not necessarily be precluded.