OPINION OF THE COURT
Thomas P. Phelan, J.
All parties are owners of adjacent residential property bordered at the rear, in whole or in part, by Merrick Bay with the exception of defendant Town of Hempstead, which owns the land underneath the bay. Plaintiffs residence occupies lot 59 known as 3038 Clubhouse Road, Merrick, New York, which he purchased in 2005. Defendants Meyerowitz occupy lot 60 known as 3050 Clubhouse Road, which they purchased in 1983. Defendants Newman occupy lot 61 known as 1695 Lynn Court, which they purchased in 1984. The northernmost lot is number 59 and the southernmost lot is 61.
Lots 59 through 61 lie upon a generally straight shoreline that juts out in a southeasterly direction from the mainland bordered by Merrick Bay on the west before turning northward to form the tip of a small peninsula bordered by East Bay on the east. There are roughly 100 residential lots along the Merrick Bay shoreline of this peninsula with the subject lots located about mid-way along this line.
Clubhouse Road runs southeasterly along the Merrick Bay side of the peninsula. Lynn Court, a cul-de-sac, bulges westerly at a right angle and comprises lots 61 through 64. Lot 65 et al. resume a southeasterly track down Clubhouse Road.
The shoreline immediately north of lot 59, running for a distance of four residential parcels (approximately 240 feet) is very straight as is most of lot 59 itself. Just before the southernmost tip of lot 59, and continuing generally southward for a distance of several parcels beyond lot 61, the shoreline becomes convex, bulging into Merrick Bay over a distance of several hundred feet before again resuming its generally straight southeasterly path.
Lot 59 is relatively rectangular in shape, while lot 61 is best described as a blunted pie shape, its shoreline being located entirely on the convex portion of the land mass.
Lot 60 does not sit entirely between lots 59 and 61. Rather, the bulk of lot 60 fronts the road and, when viewed from the road, lies in front of lot 61. At the rear of lot 60, in the *350 northeastern corner, lies a narrow strip of land, 9.2 feet wide, affording Meyerowitz access to the shoreline between lots 59 and 61. However, because the northerly boundary line of this strip intersects with the shoreline at more than a 90-degree angle and the parallel southerly boundary line intersects at less than a 90-degree angle, Meyerowitz’ water frontage is actually approximately 15 feet long.
In 1965 the predecessor in title to lot 60 applied for and received a permit to install a ramp, a floating dock, and one mooring pile. A condition of the permit issued by defendant Town of Hempstead was that the float pilings anchoring the southeast side of the dock maintain an arc of no less than 63 degrees with lot 61. The dock is 8 feet wide and 18 feet long as it extends out into the bay. The mooring pile is located approximately eight feet north of the dock.
It is conceded that the land underneath Merrick Bay is owned by the Town of Hempstead.
As a result of this court’s prior order dated March 9, 2006 (11 Misc 3d 1061[A], 2006 NY Slip Op 50329[U] [2006]) addressing various motions and cross motions of the parties, all claims, counterclaims and cross claims have been resolved other than those seeking determination of the parties’ riparian rights and the counterclaim by defendants Meyerowitz against plaintiff Muraca for trespass.
Given the dearth of evidence presented at trial on the trespass claim, it is summarily dismissed.
Also dismissed is plaintiffs ancillary request for attorney’s fees. “The law is well settled that a civil litigant may not recover attorney’s fees in the absence of contractual or statutory authority” (Wu v Kao, 194 AD2d 666, 666 [1993] [citations omitted]).
This action is precipitated by the considerable extent to which Meyerowitz’ 28-foot boat, moored on the north side of their dock between the dock and the northernmost piling, occupies surface waters in front of lot 59.
This action was tried before the undersigned without a jury on April 25, 26, 27 and 28 and May 1, 2, 9, 10 and 11, 2006.
The term riparian rights refers to the interests of land owners whose property abuts a river or stream. When the issue involves lands adjacent to tidal navigable waters such as Merrick Bay, the proper term is littoral rights. (7 Warren’s Weed, New York Real Property § 77.32 [2] [5th ed].) This distinction *351 however is often blurred by the courts and the terms used interchangeably. (Allen v Potter, 64 Misc 2d 938 [1970], affd 37 AD2d 691 [1971].) The parties to this litigation have stipulated to use the terms interchangeably and this court will do so as well.
Whether a controversy concerns riparian (freshwater) rights or littoral (saltwater) rights, the resolution sought is access to navigable waters from shoreline properties.
Although the Town of Hempstead’s undisputed ownership of the land under Merrick Bay establishes its concomitant right to grant permission to place fixed structures in and upon its land, the Town’s right to do so is subject to the right of a littoral or riparian property owner to use the waters above such land to gain access to navigable waters (see, Town of Oyster Bay v Commander Oil Corp., 96 NY2d 566 [2001]; Bravo v Terstiege, 196 AD2d 473 [1993]; Town of Hempstead v Oceanside Yacht Harbor, 38 AD2d 263 [1972], affd 32 NY2d 859 [1973]).
As stated in White, Gratwick & Mitchell, Inc. v Empire Eng’g Co., Inc. (125 Misc 47, 50 [1923], affd without op 211 App Div 834 [1924], affd without op 240 NY 648 [1925]),
“[a] riparian owner has the right to build wharves and piers from the upland out to the navigable part of the stream, but there the right ends, and he must go no farther. (Rumsey v. N. Y. & N. E. R. R. Co., 133 N. Y. 79; Yates v. Milwaukee, 10 Wall. 497.)
“In other words, the riparian owner has the right of access to the navigable portion of a stream as an incident to his ownership of the upland. The lands under water are subservient to this right of the riparian owner, and structures to enable him to reach the navigable portion of a stream are not nuisances or purprestures.”
The upland owner’s right to build out so as to gain access to navigable waters is not premised on the water’s salinity or considerations of tide, but is more a function of shape of the shoreline (7 Warren’s Weed, New York Real Property § 77.39 [2] [5th ed]) and the reasonableness of the purpose to be served by the structure (Town of Hempstead v Oceanside Yacht Harbor, 38 AD2d 263 [1972], affd on op below 32 NY2d 859 [1973]).
The term “navigable” is related to depth of water and draft of vessel. It is not disputed that all along the relevant shoreline, the water depth even at low tide is sufficient to render the bay navigable at or near the bulkheadings as the water is not graduated but is four feet deep.
*352 Seizing upon the language in White, Gratwick & Mitchell (supra), that a riparian owner’s rights over the water extend to the navigable part “but there the right ends and he must go no farther,” defendants Meyerowitz and Newman urge this court to effectively declare that the parties enjoy no riparian rights beyond those already granted by the Town as the owner of the underwater land because the depth of water at the bulkheads is four feet, a navigable depth according to the Town Code.
This court does not agree.
The right of a riparian owner to access to navigable waters includes the right to make such access “a practical reality” (Town of Oyster Bay v Commander Oil Corp., supra at 571). “[N] either the riparian owner nor the underwater landowner has an unfettered veto over reasonable land uses necessary to the other’s acknowledged rights, and where the rights conflict the courts must strike the correct balance” (id. at 572).
Similarly, in Town of Hempstead v Oceanside Yacht Harbor (supra at 264), the Court wrote:
“The defendant, as an upland owner, has a right of access to and from the channel over the plaintiffs’ foreshore (Town of Brookhaven v. Smith, 188 N. Y. 74) and that right follows the entire frontage of the defendant’s property (Tiffany v. Town of Oyster Bay, 234 N. Y. 15). The right of access comprehends the reasonable, safe and convenient use of the foreshore for navigation, fishing and such other purposes as commonly belong to the riparian owner, exercised in a reasonable manner (Tiffany v. Town of Oyster Bay, supra, p. 21). The scope of what is a reasonable, safe and convenient use of the upland owner’s riparian rights has been gradually defined on a case-to-case foundation.”
The Court then looked to “the character and size of defendant’s activities on the land under water to determine whether under the circumstances they represent a reasonable exercise of its right of access” (id. at 265).
Upon doing so, the Court took full recognition of the fact that defendant’s marina included nine floating docks which extend into East Rockaway Channel up to 100 feet and which accommodate about 150 boats at mooring rental, but, noting that the floating docks posed no threat to public navigation, concluded that defendant had the right to maintain the docks and piles.
Clearly then, the riparian rights of property owners include the right to such use of the underwater lands extending into *353 navigable waters as are necessary to provide practical access to those waters by a reasonably sized watercraft (see, Gamiel v Innes, NYLJ, July 16, 1997, at 30, col 1 [Sup Ct, Suffolk County]).
Since it is undisputed that none of the existing docks or watercraft in use by the parties impedes the public’s general navigability upon Merrick Bay, this court has authority to adjudicate the conflict between Muraca, Meyerowitz and Newman’s respective riparian claims notwithstanding the Town’s ownership of the underwater lands.
Equally unpersuasive is the claim by defendants Newman that defendants Meyerowitz or Meyerowitz’ predecessor in ownership of lot 60, or both, acquiesced in recognition of the 63-degree arc as the appropriate lateral boundary line between the riparian rights of defendants Meyerowitz and Newman.
That parties may acquiesce to certain riparian boundary lines was established in 1852 by the Court of Appeals in O’Donnell v Kelsey (10 NY 412 [1852]), wherein Judge Edmonds, writing for a unanimous Court, wrote (at 419) as follows:
“The case therefore seems to me that of two adjoining proprietors who settle by agreement among themselves the dividing line of their respective lands, and for sometime act accordingly; and in such case neither party is at liberty to depart from the arrangement.
“It is upon the doctrine of acquiescence in the dividing line between adjoining estates, and not upon that of estoppel or adverse possession, that I think the defendant is barred of his present claim, and it seems to me that his acquiescence may well be presumed from his various acts as detailed in this case.
“The doctrine of acquiescence is well recognized in the law as an admission by the party. But to have that effect, it must exhibit some act of the mind and amount to voluntary demeanor or conduct of the party, and whether it is acquiescence in the conduct or language of others, it must plainly appear that such conduct was fully known or the language fully understood by the party, before any inference can be drawn from his passiveness or silence. But where those ingredients are found the acquiescence becomes as binding as any other admission of a party.”
Neither defendants Meyerowitz nor their predecessor has been shown to have acquiesced to a riparian boundary line be *354 tween lots 60 and. 61 measured at a 63-degree arc from the bulkhead of lot 61.
The town permit allowing Meyerowitz’ piling at a 63-degree arc from Newman’s bulkhead is not demonstrative of any “voluntary demeanor or conduct” and any compliance with that permit merely constitutes deference and submission to the municipal authority which owns the underwater land. Further, the evidence at trial establishes that use of the 63-degree arc was without any substantive import. The term was merely descriptive of the location of a pile for which a permit was issued by the Town.
In any event, as neither Muraca nor his predecessor can be found to have acquiesced to a boundary line, and fixation of the line between lots 60 and 61 will greatly influence the location of the line between lots 59 and 60, it would be manifestly inequitable to bind Muraca using the equitable concept of acquiescence.
In the following passage from its March 9, 2006 order, this court identified the principles underlying adjudication of riparian disputes, as well as two favored and one generally disfavored method for doing so (11 Misc 3d 1061[A], 2006 NY Slip Op 50329[U], *4-6 [2006]):
“The general rules for the establishment of lateral boundaries regarding riparian rights are set forth in Warren’s Weed at § 77.39(2) which reads in part as follows:
“ ‘Lateral boundary determinations in New York are a composite of general propositions tempered by often repeated statements to the effect that no set of general rules will suffice to provide acceptable solutions in all cases. On the one hand, the adoption of mechanical rules applicable to all situations is renounced. On the other hand, the courts have not been loath to establish preliminary rules and to subject these rules to review in order to achieve equitable apportionment of frontage and access rights
“ ‘The overriding concern of the New York courts in extending lateral boundaries appears to be the equitable or ratable allocation of the waterfront area . . . The right of access is dependent upon the frontage available to the proprietor . . . ’ (footnoting omitted)
“Two principal formulas have been derived for *355 establishing lateral boundaries depending on the nature of the shoreline and waters.
“The most oft cited general rule for fixing the lateral boundaries of a landowner’s riparian rights ‘is to extend the lateral onshore boundaries of his property out into the navigable body of water, by lines which are perpendicular to the general course of the shoreline (citations omitted)’ (Zalay v. Huletts Island View Marina & Yacht Club, Inc., 148 AD2d 772[, 773]). The more minor the shoreline irregularities, the more equitable the application of this rule.
“The other principal rule is known as the proportional method and is designed to ascribe a path between the onshore property boundaries to the navigable channel that is proportionate to the amount of frontage the landowner enjoys. This method is often considered to better address circumstances involving the more irregular shoreline formed by a cove . . .
“Absent from favorable consideration is, perhaps, the simplest method of delineating offshore boundaries — continue the direction of the onshore boundaries outward from the shoreline.
“As explained in Warren’s Weed at § 77.39(2)
“ ‘Regardless of the shoreline configuration, upland boundaries cannot be extended outshore to form the lateral boundaries of the land under water. This simple method for extending existing boundaries would produce little difficulty if all upland boundaries intersected straight shorelines at right angles, or if curved shorelines produced outshore boundary angles which maintained access for all riparian or littoral proprietors. The norm is that upland boundaries are designated without regard to their intersection with the water’s edge. A simple extension of these upland boundaries could lead outshore in any direction. An example might be where the upland boundaries are converging. The extension of converging upland boundaries would form a triangle outshore from the land and prevent the riparian or littoral proprietor from accessing navigable waters. Likewise, if the upland boundaries were diverging, they could cross in front of the adjoining parcels of upland in such a manner as to prevent access or *356 make access more difficult. The rule in New York, therefore, states that upland boundaries are not to be extended outshore to form the lateral boundaries of the riparian or littoral right to the land under water.’ (footnoting omitted)
“When determining which general rule to apply, if any, or whether and in what manner to modify either such rule, a court’s paramount concern is to protect a landowner’s right of direct access from their entire shoreline frontage to their equitable share of the line of navigability (Freeport Bay Marina, Inc. v Grover, [149 AD2d 660,] 662).
“To do so fairly, each individual landowner’s right of direct access must be considered together with the right of direct access enjoyed by neighboring owners, none of which should be unfairly encroached upon (Id.).”
The proportional method is inapplicable to the circumstances here, as lots 59 through 61 do not involve a cove where the extension of lateral boundary lines would intersect with each other at some point within the cove.
At trial, the only expert testimony provided was by plaintiff’s witness, Theodore E Sherris, an attorney and title underwriter with many years’ experience in the area of riparian rights, and who has previously testified in court on such issues, including Freeport Bay Mar. v Grover (supra). Mr. Sherris characterized the method utilized in Zalay as either the extension method or the perpendicular method. Upon review of the Merrick Bay shoreline which included lots 59 through 61, Mr. Sherris expressed the opinion that said shoreline had only minor irregularities, properly overlooked in determining the general course of said shoreline, so as to facilitate application of the perpendicular method.
This court does not fully agree.
Due to the peculiarities of the specific shoreline between lots 59 through 61, strict application of the perpendicular rule would result in plaintiff Muraca enjoying the outshore surface waters across nearly 100% of his 62 feet of shoreline. By contrast, defendants Meyerowitz would lose access to more than a third of the outshore surface waters across their 15 feet of shoreline and defendants Newman would suffer a still greater percentage loss. More specifically, the corridor of riparian access left to defendants Meyerowitz would be less than 9.2 feet — the width *357 of the corridor of access afforded on his inshore property to reach the shoreline. Further, despite the significantly greater shoreline (100+ feet) owned by defendants Newman, their riparian rights would, as a practical matter, be reduced to less than those retained by plaintiff (62 feet).
The significant advantage gained by plaintiff were this court to strictly apply the perpendicular rule results, it appears, from the serendipitous fact that as between the parties herein only plaintiffs property lies exactly along the general course of the shoreline and it does so for nearly all of its shoreline boundary.
Equity will not countenance such a result. Modification of the perpendicular rule is therefore warranted to (1) afford defendants Meyerowitz a corridor of riparian access not less than the width of this corridor of land access, and (2) mitigate against the overly harsh loss of riparian rights to defendants Newman as the property owners with a shoreline greater than the combined shoreline of plaintiff and defendants Meyerowitz.
Accordingly, and under the particular circumstances herein, the court adopts a modified version of the generally disfavored approach of extending outshore the property boundaries between lots 59 and 60, and 60 and 61, to fix the lateral riparian boundaries between the parcels as follows: The lateral riparian boundary line between lots 60 and 61 shall be determined by extending the land boundary between these properties outshore for a distance of 30 feet from the bulkhead between these lots (lateral line 1). The boundary between lots 59 and 60 shall be determined in part by drawing a line exactly parallel to lateral line 1 but on the northerly side so as to allow a 10-foot riparian corridor (lateral line 2). A line (lateral line 3) shall then be drawn from the boundary line between lots 59 and 60 outshore to the closest (and western most) point on lateral line 2.
In so holding, the court recognizes that “[t]he underlying purpose at the forefront of the application of any riparian rules is to guarantee access by a reasonably sized water craft to the navigable waters” (Gamiel v Innes, NYLJ, July 16, 1996, at 30, col 1 [Sup Ct, Suffolk County]). The extension of lateral lines 1 and 2 outshore for a distance of 30 feet is therefore warranted given the approximate depth of four feet at the parties’ bulk-heading at low tide, the prevalence of watercraft in excess of 20 feet in length (two of the parties currently possess such vessels) and the likely need to construct a platform to facilitate boarding.
For purposes of clarity, the corridor of access afforded by lateral lines 1, 2 and 3 shall not mandate placement of pilings *358 within the corridor. Further, the Town as owner of the underwater land may in its discretion allow or prohibit placement of any necessary pilings of appropriate diameter within or without the corridor created by lateral lines 1, 2 and 3.
Whether the foregoing determination results in an inability of defendants Meyerowitz to dock their currently owned boat within their riparian rights is of little consequence to the outcome of this litigation. The corridor of access provided herein is sufficient to accommodate many reasonably sized watercraft commensurate with the very limited shorefront provided by lot 60.
To the extent that any injunctive relief has previously been granted herein, such shall continue until the judgment is signed.