Joseph ROMEO, Plaintiff,

v.

Mark SHERRY, New York Submarine Contracting Company, Inc., Robert C. Hanken, John Garner, John Garner Marine Construction and Tottenville Marina, Inc., Defendants.

Mark Sherry and New York Submarine Contracting Company, Inc., Third–Party Plaintiffs,

v.

Joseph Toth, Joseph Toth d/b/a Rimrock Trucking, Rimrock Trucking, Inc., Gladsky Marine Ship Repair & Conversion, Inc., Simpson & Brown, Inc., Warren Disch, Warren Disch d/b/a Warren Disch Construction, Disch Construction Corp., John Sneed, Shelia Lee Schwartz and Begna Associates, LTD., Third–Party Defendants.

No. 99–CV–7245 (NGG).

United States District Court, E.D. New York.

March 17, 2004.

Simon Harter, William N. France, II, New York, NY, Anthony J. Castellano, Menicucci & Castellano, P.C., Staten Island, NY, for Plaintiff.

John F. Grimes, Staten Island, NY, for Defendants.

Lawrence Jay Kahn, Freehill Hogan & Mahar, LLP, James M. Skelly, Fixler & Associates, L.L.P., Louis J. Martine, McMahon, Martine & Merritt, Deborah R. Reid, Badiak Will & Ruddy, New York, NY, for Third Party Defendants.

Robert C. Hanken, Staten Island, NY, Pro Se, for Defendants/Cross–Defendants.

*MEMORANDUM AND ORDER*

GARAUFIS, District Judge.

Joseph Romeo ("Plaintiff") brings this action for trespass, nuisance, and interference with riparian rights, claiming that vessels and objects placed in the waterway interfered with his property in Staten Island. A bench trial was held before me in Brooklyn, New York from June 17 to July 29, 2003. For the reasons set out below, Plaintiff's claims are denied, and judgment shall be entered for the defendants.

## I. PROCEDURAL HISTORY

Plaintiff is a professional wedding photographer with experience in construction and real estate investment. First Trial Transcript 215, 246–250 (hereinafter "Tr."). Plaintiff originally filed this case in the Supreme Court of the State of New York, Richmond County, and Warren Disch, then a Third–Party Defendant, removed the matter to this court on November 5, 1999 on the basis of admiralty jurisdiction.[1] 28 U.S.C. § 1333. This litigation

---

1. Approximately six months later, on May 2, 2000, Defendants requested to bring a motion to remand the case to State court, claiming that the case was improperly removed to Federal court under 28 U.S.C. § 1441. Defendants argued that § 1441 allows for (1) removal only by defendants, not third-party defendants, (2) that all defendants must join in

a petition for removal, and (3) that removal on the basis of admiralty jurisdiction alone is improper. Judge Allyne R. Ross, to whom this case was originally assigned, indicated in an order on June 15, 2000 that "[u]nder 28 U.S.C. § 1447(c), motions to remand on any basis other than lack of subject matter juris-

involves properties located on 169, 171, and 175 Ellis Street in Tottenville, along the Arthur Kill, a waterway that divides Staten Island, New York from New Jersey.

Following the filing of Plaintiff's Second Amended Complaint on April 3, 2000, Defendants moved on August 11, 2000 to dismiss the instant action under Fed R. Civ. P. 12(c). In that motion, Defendants argued that: (1) Plaintiff lacked standing; (2) the claims were preempted by federal law; (3) economic damages could not be the sole basis for recovery; and (4) Plaintiff's damages were too speculative.

In a Memorandum and Order dated January 23, 2001, the court denied Defendants' motion to dismiss. The court found that Plaintiff had standing to bring his claims. Memorandum and Order (hereinafter "M & O") 11. The court found that it had jurisdiction over Plaintiff's admiralty claims under 28 U.S.C. § 1333 and exercised supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. M & O at 3. The court examined whether the River and Harbors Appropriation Act of 1899, 33 U.S.C. § 401 *et seq.*, preempted Plaintiff's maritime tort and state common law claims and found that it did not. *Id.* at 5–8. The court did find that under *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), Plaintiff could not recover purely economic damages caused by a maritime tort unless Plaintiff could show (1) a proprietary interest in State Lands, (2) a violation of his riparian rights, or (3) an infringement of the use and enjoyment of his property beyond his riparian rights. M & O at 8–10. The court found that if the alleged facts were proved, Plaintiff could satisfy one of the prongs of this test. Finally, the

court held that Plaintiff's damages were not speculative. M & O at 11.

## II. FACTUAL BACKGROUND [2]

### A. General Background

In August, 1994, Plaintiff purchased waterfront property at 169, 171, and 175 Ellis Street from the estate of Elizabeth Snee, which was being administered by her son, Defendant John Snee ("Snee"). Stip. Fact No. 1. When Plaintiff bought the property, numerous barges lay offshore in plain sight. Plaintiff's Exhibit (hereinafter "Pl. Ex.") 52; Tr. 158–159, 185–186. At Plaintiff's request, Defendants Mark Sherry (hereinafter "Sherry") and John Garner (hereinafter "Garner") thereafter removed all barges that they conceded were theirs, leaving the five vessels which are the subject of this suit. Tr. 193.

State-owned underwater land extends from Plaintiff's property line into the Arthur Kill. In dispute is whether this property line corresponds to the high-water mark or the low-water mark. Subsequent to his purchase, Plaintiff subdivided this property into three separate lots. Stip. Fact No. 5. This subdivision left 175 Ellis Street as the sole lot owned by Plaintiff adjacent to the Arthur Kill. The other lots are not adjacent to the Arthur Kill. Pl.Ex. 2. Plaintiff sold 175 Ellis Street to Otto Zizak in 2002. Tr. 1012–1013. Plaintiff sold the other plots in 1998 and 2003. Garner Defendants' and Toth Third–Party Defendants' Proposed Findings of Fact and Conclusions of Law (hereinafter "Def. 8/20/03 Br.") 11. Consequently, Plaintiff is no longer the owner of the properties that are the subject of this case.

diction must be filed within thirty days of the filing of a notice of removal."

**2.** Unless otherwise specified, the following findings of fact are based on uncontested evidence or stipulated facts.

## B. The Obstructions

At the time of Plaintiff's purchase, fourteen steel and wooden barges lay offshore from his property. Pl.Ex. 52. Defendant Garner removed six of these barges at the Plaintiff's request. Tr. 193. Three others were removed by Defendant Sherry. Tr. 110–111, 192–193. Five barges remained at the time of the trial of this case. Two are steel barges, referred to as the "S & B 4" and the "Purple Barge," while the other three are unnamed wooden barges. Tr. 158–159, 161–163. All five barges came to their current location prior to the acquisition of the property by Plaintiff, and remained *in situ* for the entire duration of Plaintiff's ownership. Tr. 181–182.

Defendant Garner made an offer to Plaintiff to remove the two steel obstructions at no charge so long as Plaintiff first obtained permits to remove third-party property.[3] Tr. 748–749, 778–779. Garner testified that since he did not own the barges, and did not know who did, that he believed he would need such a permit before undertaking their removal. Tr. 778. Plaintiff, thinking that the offer was not genuine, declined. Tr. 116, 181–182. Zizak, the current owner of 175 Ellis Street, received the same offer from Garner once he purchased the property. Tr. 851–852. Zizak has obtained permits from the Army Corps of Engineers (hereinafter "ACOE") to remove the barges, prompting Defendant Garner to agree to remove the S & B4 and the Purple barge.[4] Tr. 781.

### i. The S & B4:

The S & B4, ("Vessel A"), is a steel barge located approximately 75 feet offshore from the high water mark of Plaintiff's property, on the foreshore.[5] Tr. 169. Third–Party Defendant Simpson & Brown, Inc. ("Simpson") acquired the vessel from a previous owner. Tr. 266. The evidence at trial indicates that Defendant Robert Hanken (hereinafter "Hanken") subsequently acquired the S & B4 in 1981 at no charge, and kept it moored on the foreshore of the Snee property (which later became the Romeo property). Tr. 400–401, 522–523, 538. This was done with the knowledge of the Snees, who did not object. Tr. 481–482. The testimony shows that, either by trade to Defendant Joseph Toth or by conveyance to Hanken through the efforts of Toth, Simpson parted with its ownership interest in the S & B4.

Two years after his acquisition of the S & B4, Hanken sold his property at 179 Ellis Street and his ownership interest in New York Submarine Co., Inc. to Defendant Sherry. Tr. 400–401; Pl.Ex. 27. The S & B4 was not listed as an item on the bill of sale. Pl.Ex. 27. Sherry testified that Hanken later offered, for free, to give Sherry items on the barge as well as the barge itself. Tr. 402–403. Sherry agreed to take a few antique anchors and a winch from the S & B4; but not the barge itself. Tr. 473–474.[6]

---

3. At trial, Defendants called Udo Drescher to testify. Mr. Drescher is an assistant regional attorney with the New York State Department of Environmental Conservation, Region 2 (hereinafter "DEC"). Mr. Drescher indicated during his testimony that a DEC permit would be needed to remove the barges. Tr. 957–958. Garner testified that an Army Corps of Engineers permit was all that was needed to prompt him to remove the barges. Tr. 748–749, 781.

4. At this time, no evidence has been submitted indicating whether or not the barges have finally been removed.

5. The land between the high and low water marks is often referred to as "the foreshore."

6. Defendant Hanken died in January, 1987. This was subsequent to the sale of his property to Sherry, but before Plaintiff purchased 175 Ellis Street and before this lawsuit was filed. Tr. 400–401.

The S & B4 was moored on the foreshore of Snee's property, where it was tied to various John Garner Marine Company ("JGMC") vessels. Tr. 59–760. In the early 1980s, Garner untied one of his barges from the S & B4, causing it to drift free. Tr. 404, 759–761, 815–816. This prompted him to move the S & B4 approximately 50 feet to prevent it from becoming, in Garner's opinion, a danger to navigation. *Id.* The S & B4 has not moved since, at least until the time of the trial in this case. Tr. 470–474, 760.

*ii. The Purple Barge:*

The Purple barge is a steel oil barge. Tr. 738. The vessel was moved by nonparties from the Chelsea Piers area and arrived in the Tottenville area on or around July 3, 1986. Tr. 708, 800–803. All parties agree that the barge has not moved since that time. Tr. 706–710, 812–813. Plaintiff testified that he believes that the Purple Barge is owned by Third–Party Defendant Sheila Lee Schwartz (hereinafter "Schwartz"), against whom he has made no claims. Tr. 162.

Plaintiff does, however, claim that "it is unlikely that Garner would have permitted a vessel as large as the Purple Barge to occupy so much of the basin area unless it was on his direction or instruction." Def. 8/20/03 Br. at 19. Garner, however, testified that he did not direct the placement of the barge, and that he did not know (until later) who was responsible for bringing the barge to its current location. Tr. 801–803.

*iii. The Offshore Wooden Vessel:*

The unnamed offshore barge ("vessel C") is a wooden vessel that has been abandoned in its current location on the foreshore for decades. Tr. 159–162, 713. Plaintiff presented no evidence of possible ownership in any Defendant, and during his testimony he admitted that he did not know who owned the barge. Tr. 162.

Garner testified that between 1980–1982 Hanken requested that JGMC wreck one of his barges and store some salvageable wooden planks from that wreckage on vessel C. Tr. 710–712. The Snee family did not raise any objections to this use of vessel C by Hanken, despite the fact that they owned the property adjacent to the foreshore at that time. Tr. 693–694.[7]

*iv. The Middle Wooden Barge:*

The middle wooden barge ("vessel D") has also been in its current position on the foreshore for decades. Tr. 159–163, 713. As with vessel C, Plaintiff states that he does not know who owns the barge. Tr. 162–163. Garner testified that at some point in the early 1980s, at Snee's direction Garner wrecked one of Snee's pile drivers and placed the debris on the Inshore Wooden Barge (see below). In order to gain access to the inshore barge, Garner testified that he needed to wreck part of vessel D and place the resulting debris on the remaining portion of that vessel. Tr. 693–694, 713–714.

*v. The Inshore Wooden Barge:*

The Inshore barge ("vessel E") is a wooden, flat-bottomed boat that has also been abandoned in its current location on the foreshore for decades. Tr. 159–163. A pile-driver belonging to Third–Party Defendant John Snee collapsed in the early 1980's and became a danger to navigation. Tr. 716–717. Defendant Garner testified that Snee directed Garner to remove the

---

7. Plaintiff contests this point, noting that Garner knew Tom Snee to have been deceased for over a decade during this period. D. Brief at 16; Tr. 693. While Tom Snee was in fact deceased, Garner also testified that his widow was in possession of the property, and his son made periodic visits. Tr. 693. Neither raised any objections. Tr. 693.

pile driver and place the resulting debris on the deck of vessel E, which was on the foreshore adjacent to Snee's (later Plaintiff's) property. Tr. 714–717.

I find that the evidence introduced did not identify any Defendants as the owners of the three unnamed wooden barges. Tr. 161–163.

## C. Damages: Plaintiff's Proposed Use of the Property

Plaintiff contends that he was unable to use the properties in the manner which he had hoped because of the presence of the barges. Specifically, Plaintiff testified as to his "dream" for a development at 175 Ellis Street. Tr. 76. As Defendants summarized, "Plaintiff claims he had a dream for development of a wedding chapel/catering hall/restaurant/community center/photography studio/wildlife sanctuary/senior citizen center/parking lot/residence for his daughter and her family/residence for himself and his wife," all on the 175 Ellis Street property. Def. 8/20/03 Br. 31; Pl. Ex. 5; Tr. 46–49, 233.

There were many obstacles standing in the way of Plaintiff's various plans. First, the area of Staten Island where the 175 Ellis Street property sits is an area zoned by the City of New York as "M–1" for heavy industrial use. Tr. 232. Neighboring property and property within visual proximity includes a shipyard, a cable-laying company, a petrochemical tank farm, a marina, a sewer outlet, and a railroad. Tr. 556–562, 571. Plaintiff never applied for (nor presented any evidence that he could obtain) approval from the city to use the land for commercial or residential purposes. Tr. 232–235. Furthermore, the numerous barges offshore (not on the foreshore of the property in question), the

neighboring shipyard's cranes, and the petrochemical tank farm across the river all impose on the scenery. Pl.Ex. 43.8, 50, 58, 74.2. Plaintiff planned to use City-owned land on Ellis Street and on Tracy Avenue (which intersects with Ellis Street), State-owned lands offshore his property, and land of his neighbor, Defendant Sherry (which Sherry refused to sell to him) as part of his business venture. Pl.Ex. 5, Tr. 46–49. Plaintiff presented no evidence that he took any steps to develop his plan, such as creating a business proposal, obtaining a cost estimate, or architectural plan (beyond the creation of a schematic drawing). Pl.Ex. 5, Tr. 215–216.

## D. Plaintiff's Return on His Investment

Plaintiff purchased the 169, 171, and 175 Ellis Street property in 1994 for $165,000. Tr. 24. Instead of developing the property into a wedding chapel or any other commercial purpose, Plaintiff refurbished the dilapidated two-family home that was present on the property when it was acquired. These renovations were completed in 1995. Plaintiff testified that he spent $200,000–$250,000 in improvements to the property, for a total investment of approximately $400,000. Tr. 218–219. Plaintiff also subdivided the property into three separate lots. Stip. Fact 5. Plaintiff sold 169 Ellis Street in 1998 for $189,000, 171 Ellis Street in 2002 for $290,000, and 175 Ellis Street in February 2003 for $288,000, for a total of $767,000. Tr. 218–219. Thus in less than nine years of ownership, Plaintiff's $400,000 investment yielded a profit of over $350,000.[8]

## E. Rights to the Foreshore

Plaintiff and Defendants agree that all lands beneath the median high water mark

---

8. While not directly related to the court's legal conclusions, this evidence demonstrates that, apart from the issue of commercial de-

velopment, the acquisition of the land by Plaintiff had actual pecuniary advantage.

of the Arthur Kill are owned by the State of New York (unless specifically granted in the form of a "letters patent" by the State of New York or predecessor sovereign). Pl.Ex. 85, Tr. 295. This includes the land between the high and low water marks (the "foreshore"). Plaintiff's own expert admitted at trial that no grant exists from the State of New York to lands between the high and low water mark offshore 175 Ellis Street. Tr. 6, 295, 301; Pl.Ex. 26, 85. Plaintiff also testified that he knew that if he were to implement a business plan that included use of the foreshore, he would need to apply to the State for a grant or lease of underwater land off his property. Tr. 233–235.

Rather than present proof of a grant from the State, Plaintiff contends that his deed for the property indicated that he owned the foreshore adjacent to his property. The deed for the property dates from an 1829 deed from Abraham Storer Hannah to James Totten. Plaintiff's deed describes the property as extending "to the beach at low water." Pl.Ex. 1. Plaintiff argues that this description, along with similar descriptions contained in past deeds for the property, is proof that 175 Ellis Street includes all land to the low water mark. Plaintiff's expert testified at trial, however, that this description could be mistaken, and that the deeds drafted by Plaintiff when subdividing the property contained errors. Second Trial Transcript of 7/29/03 (hereinafter "2Tr.") 5–6, Pl.Ex. 11. The New York Office of General Services has no record of any grant to Plaintiff for lands between the high and low water mark. Pl.Ex. 85.

Plaintiff argues that not only were his ownership rights to the foreshore damaged, but his riparian rights as the owner of 175 Ellis Street were also infringed by the obstructions. In support of this claim, Plaintiff submitted photographs into evidence of the obstructions and their positions on the foreshore. *See e.g.* Pl.Ex. 55–59, 70, 71, 95. These photographs were unaccompanied by any indication of scale, and Plaintiff failed to submit any evidence as to the size of the barges, or the degree to which they affected his access to the Arthur Kill. Testimony at trial indicated that the area encompassing the foreshore is at least 8,146 square feet. Tr. 359; Pl.Ex. 8. No testimony, however, indicated to what degree the barges obstructed the foreshore. From the photographs submitted, I find that while Plaintiff *did not* have access to the foreshore across the full frontage of his property, he *did* have access from most of his property. After reviewing the photographs, I find that the barges blocked access between the Plaintiff's property and navigable water along approximately 25% of the frontage of Plaintiff's property. Pl.Ex. 95.1.

Contrary to Plaintiff's claim of infringement with his riparian rights, I find that there was no evidence submitted that Plaintiff ever attempted to launch, land, or navigate watercraft of any kind from his property or to his property from the waterway, or that Plaintiff was obstructed from doing so. Def. 8/20/03 Br. at 49.

### F. Plaintiff's Deed for 175 Ellis Street

*i. The Dongan Grant:*

Plaintiff presented, post-trial, a submission which included a manorial grant by Governor Thomas Dongan to Captain Christopher Billopp in May, 1687. (hereinafter "Dongan Grant"). This grant gave Billopp a large tract of land (approximately 1600 acres) in the southern part of Staten Island. Pl.Ex. B1. Plaintiff contends that 175 Ellis Street is included in this area. Furthermore, the language of the Dongan Grant includes lands "unto Low Water marke," a fact Plaintiff con-

tends is dispositive as to the issue of whether or not he owned the rights to the foreshore at 175 Ellis Street.

Thomas Dongan was the English Royal Governor of New York from 1682–1688. King James II wrote a commission to Dongan, describing his powers as Governor, which included broad authority to grant territorial land. Christopher Billopp had helped to overthrow the previous Governor and was influential in installing Dongan to replace him. *See* Field Horne, *The Conference House Revisited*, 9–10 (1990). Defendants contest the assertion that the Dongan Grant included 175 Ellis Street, that the Grant itself was valid, and that even if the Plaintiff's assertions are correct, the State of New York confiscated the land in 1779 through a legislative act.

Captain Billopp built a manor house on his property, later known as the "Conference House," which still stands in Conference House Park, on Staten Island. This name originated from the September 11, 1776 peace conference between the British and the Colonists (represented by Benjamin Franklin, John Adams and Edward Rutledge) that was held on the property. At the time, the property was owned by Billopp's great-grandson, also named Christopher Billopp, who was nicknamed the "Tory Colonel." The younger Billopp organized the Staten Island militia, named "Billopp's Corps," which fought with the British against the American Colonists. *See* Horne at 23.

### ii. 1779 Act of Attainder

During the War of Independence, the State of New York passed an Act of Attainder in 1779 which found that Billopp was a "notorious offender," who, among others, was an adherent of the King and an enemy of the State who attempted to subvert the government and liberties of the State. Billopp was thus attainted of the felony of treason. The Act provided that the Billopp property was forfeited to and vested in the people of the State of New York, and Billopp was banished from the State. Should he later be found within the State's borders, Billopp was to be executed "without benefit of clergy." Brief in Opposition to Plaintiff's Post–Trial Submissions (hereinafter "Def. 10/10/03 Br.") Ex. 6 at 174.

Since Staten Island was occupied by British troops at the time of the Act, Billopp subdivided and attempted to sell his property (which realized only two-thirds of its value because the American Colonists would seize the property if they won the war). Harry B. Yoshpe, *The Disposition of Loyalist Estates in the Southern District of New York*, 49 (1967). Plaintiff submitted documents post-trial alleging that Billopp sold property containing the future 175 Ellis Street property to Samuel Ward on May 1, 1781, and that the language in the deed from this sale specified the land as reaching to the low water mark. Second Affidavit of William France (hereinafter "France Aff.2d") at 6–7. After the War of Independence, Billopp abandoned the property and fled to Canada, where the King gave him a large plot of land in New Brunswick as compensation for his loss of his Staten Island property. Ira K. Morris, *Morris's Memorial History of Staten Island, New York*, Vol. I, 150 (1900).

After confiscation, the New York State Commissioners of Forfeiture sold the Billopp property in 1784 to Thomas McFarren of New York City. Def. 10/10/03 Br. Ex. 10. The deed does not purport to grant lands to McFarren beyond the high-water mark. *Id.* Defendants therefore argue that between the time of the Dongan grant and the Hannah–Totten deed, there was a break in title to the foreshore such that "[p]laintiff could never obtain the ben-

efit of the Dongan Grant to Billopp, even if that grant was legitimate." Def. 10/10/03 Br. at 13.

In March 1790, McFarren sold the property to Caleb Ward and indicated in the deed that the property extended to the low water mark. France Aff.2d at 5, Ex. EE & FF (hereinafter "Caleb Ward deeds"). Even though the previous deed from the State to McFarren did not contain language granting ownership of the foreshore, Plaintiff argues that "the McFarren conveyance is the briefest of documents and does not purport to give a detailed description of lands." Plaintiff's Memorandum of Law In Reply to Defendants' Opposition (hereinafter "Pl. 12/17 Br.") at 3–4. Plaintiff argues that consequently, "[i]n order for McFarren to identify the lands he purchased with legal particularity, reference to the Billopp deeds to the persons identified would be necessary." *Id.* at 4. Defendants question the admissibility of the post-trial submissions that brought out facts surrounding the Dongan grant and subsequent history. Plaintiff's Letter Brief of 1/8/04 at 3. Furthermore, Defendants argue that "[i]f Plaintiff's voluminous post-trial submissions prove anything, it is that Plaintiff failed *at trial* to prove he owned [the foreshore]." *Id.* (emphasis in original).

### iii. The Incorporation of the Village of Tottenville:

Plaintiff supplemented his claim of ownership to the foreshore by presenting, post-trial, an Act of the New York State Legislature in 1869, which incorporated the Village of Tottenville. Act To Incorporate The Village of Tottenville, Laws of New York, Chap. 388, 92d Sess. (1869). This Act defines the boundaries of the Village as including lands to the low water

mark. Plaintiff argues that since the deed to 175 Ellis Street recording the property as being to the lower water mark goes back to 1829, the incorporation of Tottenville in 1869 implicitly affirmed the content of the 1829 deed. Pl. 8/20/03 Br. at 89. Defendants deny the validity of the Act, showing that it was superceded by another legislative Act in 1871, and later nullified in its entirety in 1898 as a result of the formation of the City of New York. Def. 10/10/03 Br. Ex. 1, 2.

### G. Letter from the New York Office of General Services

Plaintiff submitted an unimpeached and uncontradicted letter from the New York Office of General Services ("OGS"), dated July 14, 2000. Pl.Ex. 85. The Commissioner of General Services has jurisdiction over a variety of State-owned lands, including ungranted underwater lands. *Id.* The letter was composed by a "Real Estate Specialist" at OGS and states that the State had not granted any rights to the underwater land for Plaintiff's property. *Id.* The OGS did, however, confirm that Defendants Garner and Tottenville Marina *do* have underwater grants, and that a more accurate title search could reveal that Plaintiff shares in the grant enjoyed by Garner and the Marina. Plaintiff, in his Post–Trial Memorandum of Law, questioned the accuracy and persuasiveness of the OGS letter, asserting that it has no legal effect and "is merely informational." [9] Plaintiff's Post–Trial Memorandum of Law Pursuant to Memorandum and Order Dated 17 September 03 at 14. He has failed, however, to submit evidence that challenges the accuracy of the letter, and furthermore admits that no State grant to the foreshore exists. Pl. 12/17 Br. at 7.

---

9. The court notes that in his Post–Trial Memorandum, Plaintiff attacks the validity of this letter despite having been the party to introduce the letter in evidence at trial.

## III. FINDINGS OF LAW

Though many issues of law arose at trial, four main issues constitute the basis for my decision. First, Plaintiff submitted numerous post-trial documents in an attempt to bolster his case, all of which Defendants contend are inadmissible. The second issue is whether or not Plaintiff owns the land between the high-water mark and the low-water mark (the "foreshore"). At no point did Plaintiff allege that any of the obstructions encroached upon the high-water mark and onto the dryland of his property. Plaintiff needed to prove physical interference with his property in order to maintain trespass and nuisance claims. Third, Plaintiff asserted that Defendants interfered with his riparian rights. Finally, if liability and damages were found, Defendants argue that Plaintiff's failure to mitigate his damages is a bar to recovery.

### A. Admissibility of Post–Trial Submissions

Plaintiff's numerous post-trial exhibits, including the Dongan Grant and the Caleb Ward Deed, were submitted as part of Plaintiff's Proposed Findings of Fact and Conclusions of Law and his Memorandum of Law in Reply to Defendants' Opposition.

### i. Applicable Standard

Defendants argue that this submission was a violation of Fed. R. Civ. Proc. 52, which limits proposed post-trial findings of fact and conclusions of law to discussion of evidence submitted at trial. *See United States v. Forness*, 125 F.2d 928, 942 (2d Cir.), *cert. denied sub nom City of Salamanca v. United States*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942); *United States v. Local 1804–1, Int'l Longshoremen's Ass'n*, 831 F.Supp. 167, 169 (S.D.N.Y.1993) (holding that "[a] party who realizes, with the acuity of hindsight,

that he failed to present his strongest case at trial, is not entitled to a second opportunity by moving to amend a finding of fact or a conclusion of law."). Defendants argue that Fed. R. Civ. Proc. 59 provides the standard for introducing new facts or theories, pre-judgment, that were not previously presented at trial. *See In re Rule*, 38 B.R. 37, 42 (D.Vt.1983), *citing Seymour v. Potts & Callahan Contracting Co.*, 2 F.R.D. 38, 39–40 (D.D.C., 1941) (stating that while there is no express provision in Fed. R. Civ. Proc. 59 for a motion to rehear, there is implied recognition of such a procedure).

Plaintiff argues for inclusion of the newly discovered evidence under Fed. R. Civ. Proc. 52, 59, 60, and 61. Specifically, Plaintiff cites Fed. R. Civ. Proc. 60(b) as the standard for introduction of newly discovered evidence. Mr. France's main argument for failing to pursue these documents earlier rests on the ground of "excusable neglect." *See In re Paine Webber Short Term U.S. Gov't Income Fund*, 1995 WL 512703 (S.D.N.Y. August 29, 1995), *citing Pioneer Inv. Servs. Co. v. Brunswick Assoc.*, 507 U.S. 380, 394–395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (holding that "the excusable neglect inquiry 'is at bottom an equitable one' that should be made by considering 'the danger of prejudice to the [non-moving party], the length of the delay and its potential impact upon judicial proceedings, the reason for the delay, including whether it was in the reasonable control of the movant, and whether the movant acted in good faith.' ").

■ While it is not entirely clear which Federal Rule of Civil Procedure authorizes district courts to reopen an evidentiary record prior to judgment, it is clear that district courts have the discretion to grant such a motion: such an application to reopen the record is committed to the sound

discretion of the district court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331–32, 91 S.Ct. 795, 28 L.Ed.2d 77, *reh'g denied,* 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971); *Matthew Bender & Co., Inc. v. West Publ'g Co.,* 158 F.3d 674, 679 (2d Cir.1998) ("A district court's decision to reopen the proof to allow a party to submit additional evidence is subject to its sound discretion"); *Dow Chem. Pac., Ltd. v. Rascator Mar. S.A.,* 782 F.2d 329 (2d Cir.1986) (same); *See also Caracci v. Brother Int'l Sewing Mach. Corp.,* 222 F.Supp. 769, 771 (E.D.La.1963) *aff'd.,* 341 F.2d 377 (5th Cir. 1965) (holding that a trial court "may properly look with more favor upon a motion to reopen made after submission, but before any indication by it as to its decision") (internal citations omitted); 12 James Wm. Moore et al., Moore's Federal Practice § 59.13(3)(c) (3d ed.2002) (stating that pre-judgment motions to reopen are separate from Rule 59 motions but that district courts have discretion to grant such motions).

The Second Circuit has not yet announced a specific standard for exercising the district court's discretion in ruling on such a motion. The Second Circuit has, however, stated that:

"[o]nly 'reasonably genuine surprise' on the part of the appellant, *Moylan v. Siciliano,* 292 F.2d 704, 705 (9th Cir. 1961), combined with an assertion of the nature of the additional evidence, *Berns v. Pan Am. World Airways,* 667 F.2d 826, 829 (9th Cir.1982), would give us sufficient reason to remand for the taking of additional evidence."

*Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 495 (2d Cir.1985); *see also Matthew Bender & Co.,* 158 F.3d at 679 (upholding district court's decision to permit party to re-open a hearing where (1) additional evidence was material, (2) opposing party had opportunity for cross-examination, and (3) opposing party suffered no prejudice).

Further, the Second Circuit has cited *Garcia v. Woman's Hosp.,* 97 F.3d 810, 814 (5th Cir.1996) ("Among the factors the trial court should examine in deciding whether to allow a reopening are the importance and probative value of the evidence, the reason for the moving party's failure to introduce the evidence earlier, and the possibility of prejudice to the non-moving party") with approval. *See Matthew Bender & Co.,* 158 F.3d at 679. District courts in this circuit seem to consider similar factors in determining whether to reopen the evidentiary record before judgment has been made in actions heard without a jury. *See Shred–It USA, Inc. v. Mobile Data Shred, Inc.,* 238 F.Supp.2d 604, 607 (S.D.N.Y.2002) (holding post-trial submissions inadmissible where there was no compelling reason why the trial record should be reopened, the failure to introduce the post-trial submission at trial reflected lack of due diligence, and admission of evidence would have caused undue prejudice); *John v. Sotheby's, Inc.,* 858 F.Supp. 1283, 1288 (S.D.N.Y.1994) (holding that when appraising a party's motion to reopen the record post-trial, "the court must consider (1) whether or not the moving party's failure to submit evidence was the result of its own lack of diligence; (2) the extent to which reopening the record might prejudice the nonmovant; and (3) where the interests of justice lie."). I shall consider the issue of Plaintiff's post-trial submissions under the three-prong test articulated in *John v. Sotheby's, Inc.*

### ii. Movant's Diligence

With reference to the first prong, Plaintiff's attorney France argues in his first post-trial affidavit that the Dongan Grant was "not a document that I should reasonably have searched for before preparation

of post-trial submissions ... [or] produce during pre-trial discovery." Affidavit of William France (hereinafter "France Aff.") at 4. Counsel argues ·that he considered deeds dating back as far as 1829 recording the boundary to the low-water mark as sufficient to support Plaintiff's nuisance and trespass claims, and that the Dongan Grant was more "a legal premise or justification for the waterside boundary recorded in the deeds." *Id.*

Defendants, however, disputed Plaintiff's claim of ownership to the foreshore as early as their pre-trial memorandum. Def. Pre–Trial Mem. at 14. Furthermore, Defendants argue that Plaintiff's lack of diligence is evidenced by the fact that the post-trial submissions are public records that have been available for over 200 years, and thus were not documents withheld by Defendants. Def. 10/10/03 Br. at 5–6. Nor are they "new evidence" which was not in existence prior to trial. *Id.*

Plaintiff's counsel admits that he did not attempt to locate the documents until after the conclusion of trial, and that he had no difficulty locating them at that time. France Aff. at 2–4. Defendants argue that such conduct by Plaintiff's counsel "is a *per se* failure to exercise the diligence required when attempting to introduce new evidence, and provides clear grounds for exclusion." Def. 10/10/03 Br. at 6.

I find that if admitted, these documents would not simply bolster Plaintiff's claim to the foreshore, as Mr. France argued. The documents, if admitted, would have more of a positive effect on Plaintiff's claim than any evidence he proffered at trial. Yet Plaintiff's counsel had ample time prior to trial to discover the documents, which have been in a New York State repository for over 200 years. The lack of diligence by Plaintiff's counsel in pursuing this evidence and bringing it to the court's attention in a timely fashion was the result of. his own actions (or inaction).

### iii. Prejudice to Non–Moving Party

With respect to the second prong, Defendants argue that allowing such evidence to be admitted without the benefit of discovery ˙ or cross-examination would be a highly prejudicial violation of Defendants' due process rights. *See Townley v. Heckler,* · 748 F.2d 109, 114 (2d Cir.1984); *Graves v. Am. Express,* 175 Misc.2d 285, 286, 669 N.Y.S.2d 463 (1997) ("a person's constitutional right to due process of law includes the basic right to cross-examine."); *Matter of Hoffman,* 138 A.D.2d 785, 786–787, 525 N.Y.S.2d 423 (3d Dep't.1988); *see also* Fed. R. Civ. Proc. 26 (detailing the "General Provisions Governing Discovery").

Plaintiff believes the fact that Defendants responded to Plaintiff's first round of post-trial exhibits (including the Dongan Grant)˙by submitting exhibits of their own is significant. Plaintiff argues that because Defendants have submitted post-trial evidence in response to Plaintiff's exhibits, they cannot claim prejudice with regard to subsequent proposed exhibits submitted by Plaintiff (such as the Caleb Ward deeds).

I find that Defendants were not provided with the documents during discovery, nor were they permitted their right to cross-examination at trial, and thus admission of these documents would be prejudicial to Defendants.

### iv. Interests of Justice

Mr. France, citing *Ferrell v. Trailmobile, Inc.,* 223 F.2d 697, 698 (5th Cir.1955), further argues that the documents should be admitted to prevent injustice. In *Ferrell,* the Fifth Circuit held that "conclusive evidence" submitted post-trial must be considered despite the defendant's lack of

diligence in finding dispositive evidence, once that evidence was found. *Ferrell* was distinguished in *Niedland v. United States*, 338 F.2d 254, 260 (3d Cir.1964), on the grounds that the newly discovered evidence at issue in *Niedland* only raised a doubt as to the correctness of the judgment, rather than providing conclusive proof as in *Ferrell*. I find that the instant case is analogous to *Niedland*, in that Plaintiff's post-trial submissions constituted evidence, not conclusive proof, that he owned the foreshore.

■ I find that Defendants disputed Plaintiff's claim of ownership to the foreshore long before trial, and therefore arguments that the deed was defective should have been anticipated. Plaintiff and his lawyer made an affirmative choice not to pursue these documents, and to permit the introduction of such evidence in these circumstances would grant Plaintiff "a second bite of the apple" to correct his oversight. *See Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir.1998). The interests of justice do not dictate granting Plaintiff this second chance.

### v. *Plaintiff's Post–Trial Submissions are Inadmissible*

I am persuaded by Defendants' arguments on this question. Under the *John v. Sotheby's* test, Plaintiff's lack of diligence is a result of his own conduct; the evidence, if admitted, would be highly prejudicial to Defendants, and the interests of justice do not support the admission of the evidence. For these reasons, I find that all evidence submitted by Plaintiff post-trial is inadmissible, and therefore the court will not consider this evidence.

### B. Ownership of the Foreshore:

■ Unless specifically granted, states are the owners of all lands subject to the ebb and flow of the tide (i.e. the foreshore).

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) (holding that "long-standing precedents . . . hold that the States, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide."). While conducting a state-by-state analysis of this issue, the United States Supreme Court has noted that "[i]n New York, it was long considered as settled law that the State succeeded to all the rights of the crown and parliament of England in lands under tide waters, and that the owner of land bounded by a navigable river within the ebb and flow of the tide had no private title or right in the shore below high-water mark . . ." *Shively v. Bowlby*, 152 U.S. 1, 20–21, 14 S.Ct. 548, 38 L.Ed. 331 (1894).

■ As stated above, Plaintiff admitted at trial that the State did not grant any rights or property to any previous owner of the 175 Ellis Street property. Furthermore, Plaintiff's own expert witness testified that errors in deeds are common, and that some of Plaintiff's own deeds contained errors. In light of the fact that no external proof exists that the foreshore was granted to the Plaintiff, I find that title to the 175 Ellis Street foreshore remains in the State.

### C. Proof of Ownership of the Foreshore:

Plaintiff asserts that his right to the foreshore did not derive from a grant from the State, but instead from a colonial grant from Thomas Dongan, the Governor of Staten Island.

Even if the court were to consider Plaintiff's post-trial submissions, including the Dongan grant and the Caleb Ward deeds, the court would find that Plaintiff did not own the foreshore.

The Dongan Grant transferred to Christopher Billopp approximately 1600 acres of property on Staten Island and designated that the foreshore was included in the boundary of the property. Pl.Ex. B1. New York courts have found, under the public trust doctrine, that large grants of land to private individuals are *ultra vires* and void. *See Marba Sea Bay Corp. v. Clinton St. Realty Corp.*, 272 N.Y. 292, 296, 5 N.E.2d 824 (1936) (holding, in reference to an eleven mile grant of the foreshore, that "[n]either the King nor the State could grant away for private purposes so much of the public's rights in the lands under water."); *Coxe v. State*, 144 N.Y. 396, 406, 39 N.E. 400 (1895) (holding that "the conclusion is inevitable that the Parliament and the Crown together were not competent to grant to a private corporation, for private purposes, the seacoast around the island below the shore line, without violating established principles of law."); *see also Evans v. City of Johnstown*, 96 Misc.2d 755, 410 N.Y.S.2d 199, 207 (N.Y.Sup.Ct.1978) (holding that grants from Parliament and the Crown for "purely private purposes" are ineffective). Though the Dongan Grant was not as large as the one at issue in *Marba*, the size of the grant and the fact that it was issued for purely private purposes leads me to find that the Dongan grant violated the public trust doctrine. Plaintiff therefore cannot claim title to the foreshore adjacent to his property from this source.

Furthermore, while the Dongan Grant to Christopher Billopp did indeed encompass lands to the low water mark, this land was later confiscated by the State after Captain Billopp's attainder for treason during the Revolutionary War. The 1779 Act of Attainder has been found to be valid by the Second Circuit numerous times, as recently as 1992. *See Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 415 (2d Cir.1992) (holding that "[i]n adjudicating property rights affected by New York's Act of Attainder of 1779, neither the Supreme Court nor any court of New York State has ever declared the Act to be invalid.").[10]

While Plaintiff does not dispute the validity of the 1779 Act, he does claim that the property the State sold McFarren was the *identical* property that was confiscated from Billopp, *i.e.* including the foreshore. Plaintiff does not dispute the fact that the deed to McFarren contained no mention of the "low water mark," but instead argues that since the Caleb Ward deed included the foreshore, McFarren must have believed that he owned it.

■ What McFarren did or did not believe is immaterial. The State did not include such language in the deed. Def. 10/10/03 Br. Ex. 10. In light of the public interest involved, I find that McFarren did not receive a grant to the foreshore.

Consequently, Plaintiff was unable to show, even with the inclusion of the inadmissible post-trial submissions, that he possessed the foreshore adjacent to 175 Ellis Street. Not only was the original Dongan Grant a violation of the public trust doctrine, but the effect of the Grant was later superceded by the 1779 Act of Attainder.

### D. Cause of Action in Trespass

■ The essence of a trespass, a state law claim, is an injury to the right of

---

**10.** Plaintiff does not challenge the validity of the Act. The court notes that such a challenge, if brought, could be barred by the statute of limitations. The *Robins Island* Court held that claims to land based on the 1779 Act were barred by the applicable statute of limi- tations and the doctrine of laches. 959 F.2d at 423–424 (stating that "there must arrive a point at which title to land is settled. Overturning a two hundred year old chain of title would result in gross prejudice ...").

possession. 104 N.Y. Jur.2d, Trespass § 10. The Second Circuit has described this cause of action under New York law as "the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1361 (2d Cir.), *cert. denied* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) (finding summary judgment on a trespass claim to be appropriate against anti-abortion groups protesting on an abortion clinic's property), *citing Ivancic v. Olmstead*, 66 N.Y.2d 349, 352, 497 N.Y.S.2d 326, 488 N.E.2d 72, *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 658 (1986); *see also Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331, 121 N.E.2d 249 (1954).

▮ To succeed in an action for trespass, Plaintiff must prove that there was a wrongful or unjustifiable entry upon his land. *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir.1996) (holding that under New York law, "trespass is the intentional invasion of another's property."). As explained above, the barges at issue are located on State-owned land. I find that Plaintiff has failed to show interference with his right of possession of the land, and consequently his trespass claim fails.

### E. Infringement of Riparian Rights

Even if his trespass claim should fail because he cannot prove ownership to the foreshore, Plaintiff further argues that the barges constitute a physical interference with his riparian rights as upland owner of 175 Ellis Street. Pl. 8/20/03 Br. at 99. While most of the applicable cases for this issue are relatively old, New York's highest court has reaffirmed recently that "riparian owners still enjoy their full panoply of rights, subject only to the long-recognized navigational servitude." *Adirondack League Club, Inc. v. Sierra Club et al.*, 92 N.Y.2d 591, 603, 684 N.Y.S.2d 168, 706 N.E.2d 1192 (1998).

Plaintiff does not claim that the State granted or leased to him the land under water offshore his property. *See* McKinney's Public Lands Law § 75 (authorizing "grants, leases, easements, and lesser interests, including permits, for the use of state-owned land underwater ... consistent with the public interest in the use of state-owned lands underwater for purposes of navigation, commerce, fishing, bathing, and recreation"); Tr. Trans. 55; Pl.Ex. 85.

▮ In the absence of such a grant or lease, a riparian owner only has a right to free ingress and egress to abutting navigable waters. *See Oelsner v. The Nassau Light and Power Co.*, 134 A.D. 281, 286, 118 N.Y.S. 960, 964 (2d Dep't.1909) (finding that the principal attribute of riparian use is "access to and egress from the open water."); *see also Yates v. City of Milwaukee*, 77 U.S. (10 Wall.) 497, 504, 19 L.Ed. 984 (1870) (holding that riparians owners have the right of "access to the navigable part of the river ... the right to make a landing, wharf or pier ... subject to such general rules and regulations [of] the legislature."); *Sound Marine & Mach. Corp. v. Westchester County*, 100 F.2d 360, 363 (2d Cir.1938) (holding that appellant landowner who complained of a sewer pipe being laid offshore his property had "the incorporeal right to free ingress and egress to abutting navigable waters"); *Allen v. Potter*, 64 Misc.2d 938, 316 N.Y.S.2d 790 (N.Y.Sup.Ct.1970) (finding, in reference to riparian rights, that, "[g]enerally speaking such rights are: (1)[u]se of water for general purposes as bathing and domestic use; (2)[w]harf out to navigability; (3)[a]ccess to navigable waters.").

Plaintiff argues that any interference, however slight, is an interference with his riparian rights. For this proposition,

Plaintiff cites *Tiffany v. Town of Oyster Bay, et al.*, 234 N.Y. 15, 136 N.E. 224 (1922), in which the town erected a series of bathhouses along the filled-in foreshore in front of Tiffany's property. In *Tiffany*, the plaintiff's foreshore had been filled in with sand and soil, and the defendant-town constructed a substantial number of large bungalows on the foreshore. *Tiffany*, 234 N.Y. at 18–19, 136 N.E. 224. These structures blocked access to navigation along approximately fifty percent of the frontage of the property. *Id.* The Court of Appeals held that "[t]he town may not fill in, occupy, and obstruct with buildings the foreshore . . . so as to interfere with the rights of owners of the upland, although they may still be able to reach the water. Their rights pass along the whole frontage of their property." *Id.*, at 23, 136 N.E. 224. It would be possible to read this language to hold that any interference with access to the water, no matter how small, violates the upland owner's riparian rights. However, such a reading is problematic for two reasons. First, such a reading is far broader than the actual facts of *Tiffany*, where the defendant had blocked approximately fifty percent of the frontage of the plaintiff's property. As a result, there can be no question that the language is merely *dicta*.

Second, subsequent New York cases indicate that this more narrow reading is correct. Cases citing *Tiffany* have largely recognized that the upland owner's right of access is not absolute; rather, riparian owners have the mere right to reasonable access to navigable waters. *See e.g. Town of Oyster Bay v. Commander Oil Corp.*, 96 N.Y.2d 566, 734 N.Y.S.2d 108, 113, 759 N.E.2d 1233 (2001)(hereinafter *"Commander"*) (holding, after analysis of *Tiffany* and other similar cases, that "well over a century of common law adjudication has established the riparian owner's right to reasonable access"). In *Commander*, the Court of Appeals ruled that a riparian owner could dredge if dredging was necessary to preserve reasonable access to navigable water and did not unreasonably interfere with the owner of the underwater land (the foreshore). *Commander*, 734 N.Y.S.2d at 113–114, 759 N.E.2d 1233. The court noted, however, that "[t]he riparian owner's right is not to maintain the foreshore in any fixed condition, but rather to enjoy reasonable access to navigable water." *Id.*, 734 N.Y.S.2d at 112–114, 759 N.E.2d 1233.

"The scope of what is a reasonable, safe and convenient use of the upland owner's riparian rights has been gradually defined on a case-to-case foundation." *Haher's Sodus Point Bait Shop, Inc. v. Wigle*, 139 A.D.2d 950, 951, 528 N.Y.S.2d 244, 246 (4th Dep't.1988), *citing Town of Hempstead v. Oceanside Yacht Harbor, Inc.*, 38 A.D.2d 263, 328 N.Y.S.2d 894, 896 (2d Dept 1972) (citing *Tiffany*, and holding that "[t]he right of access comprehends the reasonable, safe, and convenient use of the foreshore for navigation"); *see also Stutchin v. Town of Huntington*, 71 F.Supp.2d 76, 100–101 (E.D.N.Y.1999), *Bravo v. Terstiege*, 196 A.D.2d 473, 601 N.Y.S.2d 129 (2d Dep't.1993). The *Haher's* court conducted this reasonable access analysis looking "to the character and size of the . . . activities on the land under water to determine whether under the circumstances they represent a reasonable exercise of [the] right of access." *Haher's*, 528 N.Y.S.2d at 247 (holding that "[p]etitioner's construction of commercial dockage over more than an acre-and-a-half of public waters . . . exceeded the reasonable scope of the common law rights it has acquired by virtue of its ownership of a small parcel of riparian land.").

In the instant case, many factors are relevant to an analysis of whether Plaintiff had "reasonable" access to the Arthur Kill.

First, it is apparent from aerial photographs and from relevant testimony that the presence of sunken or abandoned barges offshore Plaintiff's property is not unique in the area. Plaintiff himself submitted an ACOE list of hundreds of derelict vessels in the Arthur Kill. Pl.Ex. 86, 88. Placing vessels on the foreshore of Plaintiff's property appears to be more reasonable in light of the local practice.

On the other hand, the policy of the State "has been directed toward encouraging the private development of waterfronts, subject only to the condition that the use be reasonable and not obstructive of navigation." *Town of Hempstead,* 328 N.Y.S.2d at 898. Though Plaintiff's stated goal was the development of his property, the 175 Ellis Street property was located in an area zoned for heavy industry. Even if the five barges at issue had been removed, Plaintiff would still have been attempting to conduct a commercial enterprise in front of a backdrop of other abandoned barges, a petrochemical plant, a shipyard, and a marina.

Another relevant factor to consider for this reasonable access inquiry is the offer made by Garner to remove the two steel barges, which Plaintiff declined. Whatever infringement Plaintiff suffered respecting his access to navigation would have been considerably diminished if he had obtained a permit from the ACOE.

 Finally, had Plaintiff provided evidence that the barges prevented him from reasonable access to the Arthur Kill, such evidence would have weighed heavily in favor of this claim. Yet, as stated above, Plaintiff presented no evidence of having ever lived at 175 Ellis Street, of ever attempting to launch or land a water craft at the property, or of ever navigating the waters of the Arthur Kill offshore his

property. Tr. 7, 55. Furthermore, with the exception of photographs, Plaintiff presented no evidence indicating interference with his navigational rights, or the extent of any alleged interference. Consequently, there is nothing in the record to show that Plaintiff was unable to freely exercise his rights of egress and ingress. Plaintiff never exercised, or attempted to exercise, his riparian rights of navigation, and in light of the "reasonableness" analysis above, has failed to meet his burden to present evidence that Defendants prevented him from having reasonable access to the waterway. For these reasons, Plaintiff's claim of interference with riparian rights is denied.

### F. Cause of Action in Nuisance

 Plaintiff contends that the presence of the barges upon his land was grounds for a state claim of private nuisance.[11] In New York, a private nuisance is defined as (1) an interference substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a person's property right to use and enjoy land and, (5) caused by another's conduct in acting or failure to act. *See Copart Indus., Inc. v. Consol. Edison Co. of N.Y., Inc.,* 41 N.Y.2d 564, 570, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977). As a matter of law, the presence of unsightly objects, or eyesores, does not constitute substantial interference with a person's property right (even if placed intentionally). *See e.g. Dugway, Ltd. v. Fizzinoglia,* 166 A.D.2d 836, 837, 563 N.Y.S.2d 175, 176–177 (3d Dep't.1990) (holding that plaintiff could not pursue an action for private nuisance against an adjoining landowner who intentionally placed debris and an uninhabitable trailer in close proximity to main entrance to developer's property in order to create an eyesore).

---

11. Plaintiff does not argue that they are a public nuisance.

Under the first and fourth prongs of this test, in order to prove his claim of private nuisance Plaintiff must have shown that there was an invasion of or interference with his land. *Copart*, 41 N.Y.2d at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968. As discussed above, Plaintiff was unable to prove at trial that he is the owner of the land upon which the barges now rest. Since no invasion of Plaintiff's land was shown, examination of the other prongs of the *Copart* test are unnecessary, and Plaintiff's claim of private nuisance is denied.

As an alternative, Plaintiff argues that even if he does not own the foreshore, his interest as riparian upland owner of 175 Ellis Street is a valid basis for a nuisance claim. Pl. 8/20/03 Br. at 102–105. Plaintiff cites the Restatement (Second) of Torts § 821E, which states that "[f]or a private nuisance there is liability only to those who have property rights and privileges in respect to the use and enjoyment of the land affected, including . . . b) owners of easements and profits in the land." Rest.2d Torts § 821E. As explained above, Plaintiff's only interest in the foreshore is that of an easement providing free ingress and egress to the abutting navigable waters. As I have already determined Plaintiff's interest in and enjoyment of this right was not disturbed by the presence of the barges, Plaintiff cannot maintain his nuisance claim based on this theory.

### G. Plaintiff's Failure To Mitigate Damages

Even if Plaintiff had proven that Defendants trespassed on Plaintiff's land, Plaintiff's claim would fail, insofar as it relates to the two steel barges, because Plaintiff did not mitigate his damages.

New York courts adhere to the universally accepted common law principle that a harmed plaintiff must mitigate damages. *Air Et Chaleur*, 757 F.2d at 494 (holding that the district court properly applied New York's mitigation doctrine against plaintiff stockholders who brought suit for breach of contract.); *see also Hamilton v. McPherson*, 28 N.Y. 72, 76–77 (N.Y.1863) (requiring "reasonable exertions to render the injury as light as possible").

Defendants introduced testimony that they agreed to remove the steel barges for free so long as Plaintiff obtained permits for such action from the ACOE. Tr. 748–749, 778–779. Plaintiff countered this assertion by arguing that he did not believe the offer to be genuine, so he did not act on it. Pl. 8/20/03 Br. at 30. Plaintiff produced no other evidence that he took any steps, other than filing this lawsuit, to limit the effects of these barges. Had Plaintiff followed through on Garner's offer, his damages from the steel barges would be zero, as there is no fee required for an ACOE permit. 33 CFR § 330.[12] I find that Plaintiff, with regard to the steel barges, thus failed to perform his duty to mitigate his damages.

### H. Adverse Possession

Plaintiff raised an argument in his last post-trial submission that he possessed the foreshore through adverse possession. Pl. 12/17 Br. at 7–8. Even ignoring the lateness of this argument, Plaintiff's claim would fail.

In New York, claims for adverse possession under a written instrument are governed by statute:

> Where the occupant or those under whom he claims entered into the posses-

---

**12.** While there was conflicting testimony as to whether a DEC and/or ACOE permit was required, I find that Garner would have re- moved the barges had Plaintiff obtained an ACOE permit.

sion of the premises under claim of title, exclusive of any other right, founding the claim upon a written instrument, as being a conveyance of the premises in question ... and there has been a continued occupation and possession of the premises included in the instrument ..., or of some part thereof, for ten years, under the same claim, the premises so included are deemed to have been held adversely ...

Real Property Actions and Proceedings Law § 511 (McKinney's 1962) (hereinafter "RPAPL § 511").

Plaintiff submitted evidence that the Snees had kept tugs and barges on the foreshore since 1974. Pl. 12/17 Br. at 8. Furthermore, the deed to his property stated that he held title to the foreshore. Pl.Ex. 1.

In New York, however, "the State's sovereign title is inalienable except by grant." *Hawkins v. State,* 54 Misc.2d 847, 283 N.Y.S.2d 615, 621 (N.Y.Ct.Cl.1967). In *Hawkins,* the plaintiff claimed that the deed for the property conveyed to him included waters of the East Bay (which is part of the navigable waters of Lake Ontario). The court held that the deed:

> while strong evidence ... cannot serve to establish title against the State, absent a showing that the State has ever relinquished, alienated or transferred its sovereign right of ownership by express grant ...; nor may claimants found a title by adverse possession under claim of title based on the [ ] deed for to do so would deprive the State of its inalienable sovereign power, the existence of which may not be doubted."

*Id.; see also City of New York v. Sarnelli Bros., Inc.,* 280 A.D.2d 573, 574, 720 N.Y.S.2d 555, 556 (2d Dep't.2001) (holding that "lands held by a municipality in its governmental capacity may not be lost by adverse possession"); *Gunn v. Bergquist,*

201 Misc. 992, 108 N.Y.S.2d 644, 646–647 (N.Y.Sup.Ct.1951) (holding that "tidal lands ... which the town holds in a governmental capacity may not be alienated and hence may not be the subject of acquisition by adverse possession.")

█ Plaintiff could not adversely possess the foreshore adjacent to his property, since as a navigable waterway it is inalienable except by grant. *Hawkins,* 283 N.Y.S.2d at 621. As such, I find that Plaintiff's claim of adverse possession fails.

## IV. CONCLUSION

Plaintiff asserted claims of trespass, nuisance, interference with riparian rights, and adverse possession. The trespass and nuisance claims required Plaintiff to prove either a grant from the State of the foreshore, or ownership thereof. Even considering Plaintiff's post-trial submissions, Plaintiff did not prove that he owned the foreshore, and therefore his first two claims are denied.

Next, Plaintiff claimed that the obstructions interfered with his riparian rights. Plaintiff failed to meet his burden of proving that he did not have reasonable access to the waterway in order to exercise his navigational rights. As such, Plaintiff's claim in this regard is denied.

Furthermore, even if Plaintiff had proven that Defendants trespassed on Plaintiff's land, Plaintiff's claim with regard to the Purple barge and the S & B4 would fail because Plaintiff did not mitigate his damages.

Finally, Plaintiff claimed that he obtained title to the foreshore adjacent to his property by adverse possession. Navigable waterways are inalienable except by grant, and therefore his adverse possession claim is denied.

For the foregoing reasons, judgment shall be entered for Defendants on all claims.

### i. Sanctions

Defendants have asked this court, in light of Plaintiff's inadmissible post-trial submissions, to impose sanctions pursuant to 28 U.S.C. § 1927. This section holds attorneys personally liable for excess costs if the attorney "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Courts in this circuit construe the statute "narrowly and with great caution, so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." *Mone v. C.I.R.*, 774 F.2d 570, 574 (2d Cir.1985) (internal citations omitted).

The purpose of the statute is to avoid dilatory tactics, to deter unnecessary delays in litigation, and to deter bad faith conduct by attorneys. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL–CIO,* 948 F.2d 1338, 1345 (2d Cir.1991); *Hudson Motors P'ship v. Crest Leasing Enters., Inc.,* 845 F.Supp. 969, 978 (E.D.N.Y.1994); *Herrera v. Scully,* 143 F.R.D. 545, 551–552 (S.D.N.Y.1992). Furthermore, § 1927 "requires a clear showing of bad faith," unlike the objective standard of Fed. R. Civ. Proc. 11. *Novelty Textile Mills, Inc. v. Stern,* 136 F.R.D. 63, 72–73 (S.D.N.Y.1991); *see also Int'l Bhd. of Teamsters,* 948 F.2d at 1345 ("Bad faith is the touchstone of an award under this statute."); *Hudson Motors* 845 F.Supp. at 978 (holding that "[w]ithout a demonstration of bad faith on the part of the attorney in question, sanctions pursuant to this statute are inappropriate.").

In the present matter, Plaintiff's attorney did submit numerous post-trial submissions which were later found inadmissible. It is the opinion of this court, however, that Mr. France intended to bolster his client's case, not to delay the litigation or harass Defendants. Mr. France did not act in bad faith when submitting his post-trial exhibits and motions, and therefore Defendants' motion for sanctions is denied.

SO ORDERED.